## SPONENBARGER et al. v. UNITED STATES.
### No. 11090.

Circuit Court of Appeals, Eighth Circuit.

Feb. 8, 1939.

Rehearing Denied Feb. 27, 1939.

WOODROUGH, Circuit Judge, dissenting.

Lamar Williamson, of Monticello, Ark. (E. E. Hopson, of McGehee, Ark., and Williamson & Williamson, of Monticello, Ark., on the brief), for appellant Mrs. Julia Caroline Sponenbarger.

Fred Armstrong, of St. Louis, Mo. (Thompson, Mitchell, Thompson & Young, Henry Davis, and Bryan, Williams, Cave & McPheeters, all of St. Louis, Mo., on the brief), for appellant Mercantile-Commerce Bank & Trust Co., et al.

Fred A. Isgrig, U. S. Atty., of Little Rock, Ark. (John C. Dyott and John S. Gatewood, Sp. Assts. to Atty. Gen., on the brief), for the United States.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

Appellant Sponenbarger owns forty acres of land in Desha County, Arkansas. August 11, 1934, she filed action in the District Court of the United States for the Eastern District of Arkansas, under the Tucker Act (28 U.S.C.A. § 41(20) for compensation for the alleged taking of her said property, claiming that its fair market value was reduced as a result of the establishment of Boeuf Floodway, which includes the land in question, under authority of the Mississippi River Flood Control Act of May 15, 1928 (33 U.S.C.A. § 702a et seq.). The destructive flood of 1927 aroused the Congress into recognition of the fact that flood control of the Mississippi River is a national problem

and a national responsibility. Accordingly, December 1, 1927, the Chief of Engineers, Major General Edgar Jadwin, submitted a report to the Secretary of War embodying a project for the flood control of the Mississippi River. This report was printed as House Document Number 90, Seventieth Congress, First Session. The project submitted was commonly called the "Jadwin Plan" in honor of its author. May 15, 1928, Congress enacted a Flood Control measure (45 Stat. 534 et seq.) based upon this report of General Jadwin. Such parts of this Act as are deemed essential or material to the issues here under consideration are:

From Sec. 1. "That the project for the flood control of the Mississippi River in its alluvial valley and for its improvement from the Head of Passes to Cape Girardeau, Missouri, in accordance with the engineering plan set forth and recommended in the report submitted by the Chief of Engineers to the Secretary of War dated December 1, 1927, and printed in House Document Numbered 90, Seventieth Congress, first session, is hereby adopted and authorized to be prosecuted under the direction of the Secretary of War and the supervision of the Chief of Engineers: Provided, That a board to consist of the Chief of Engineers, the president of the Mississippi River Commission, and a civil engineer chosen from civil life to be appointed by the President, by and with the advice and consent of the Senate, * * * is hereby created; and such board is authorized and directed to consider the engineering differences between the adopted project and the plans recommended by the Mississippi River Commission in its special report dated November 28, 1927, and after such study and such further surveys as may be necessary, to recommend to the President such action as it may deem necessary to be taken in respect to such engineering differences and the decision of the President upon all recommendations or questions submitted to him by such board shall be followed in carrying out the project herein adopted. The board shall not have any power or authority in respect to such project except as hereinabove provided."

From Sec. 2. "In view of the great expenditure estimated as approximately $292,000,000, heretofore [prior to May 15, 1928], made by the local interests in the alluvial valley of the Mississippi River for protection against the floods of that river; in view of the extent of national concern in the control of these floods in the interests of national prosperity, the flow of interstate commerce, and the movement of the United States mails; and, in view of the gigantic scale of the project, involving flood waters of a volume and flowing from a drainage area largely outside the States most affected, and far exceeding those of any other river in the United States, no local contribution to the project herein adopted is required."

From Sec. 3. "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: Provided, however, That if in carrying out the purposes of this Act [sections 702a to 702m of this title] it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands."

From Sec. 4. "The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River: Provided, That in all cases where the execution of the flood-control plan herein adopted results in benefits to property such benefits shall be taken into consideration by way of reducing the amount of compensation to be paid. The Secretary of War may cause proceedings to be instituted for the acquirement by condemnation of any lands, easements, or rights of way which, in the opinion of the Secretary of War and the Chief of Engineers, are needed in carrying out this project."

From Sec. 9. "The provisions of sections 13, 14, 16, and 17 of the River and Harbor Act of March 3, 1899 [sections 407, 408, 411, 412 and 413 of this title] are hereby made applicable to all lands,

waters, easements, and other property and rights acquired or constructed under the provisions of this Act [sections 702a to 702m of this title]."

May 27, 1929, the Secretary of War submitted to Attorney General Mitchell an inquiry "whether the project in House Document, 70th Congress, 1st Session, is the legal project to be executed in accordance with law, and whether this project is already fixed and not subject to review by this administration". The Attorney General pointing out that only "engineering differences" were to be inquired into by the special board, created by the Act, "all other differences between the plans, if any, having been definitely resolved by Congress in favor of the plan of December 1, 1927", and that "questions such as the obligation to provide flowage rights, or to make compensation in connection therewith, do not fall within the term 'engineering differences'", advised the Secretary of War that "the project set forth in House Document No. 90, 70th Congress, 1st Session, is the legal project to be executed in accordance with the law". Opinions of Attorneys General, vol. 36, p. 80.

The district court, having made findings of fact submitted by the defendant United States, held generally that "it cannot be successfully contended that plaintiff's land has been appropriated by the defendant, thereby giving rise to an implied contract to compensate the owner." 21 F.Supp. 37. Accordingly, judgment was awarded defendant, appellee herein.

As stated by the trial court, the Jadwin Plan, adopted by the Flood Control Act of May 15, 1928, embodied an extensive flood control program in the Mississippi Valley from Cape Girardeau, Missouri, to the Head of the Passes in Louisiana.

"That portion of the plan of immediate concern in this case deals with the suggested treatment of the Mississippi River from the White and Arkansas Rivers on the north, to the Red River on the south, usually referred to as the 'Middle Section'."

The court in its opinion thus states succinctly the Jadwin Plan provision for the Boeuf Floodway and the essential features of the Floodway:

"The Jadwin plan made provision for a floodway starting shortly south of the mouth of the Arkansas River, at Cypress Creek, thence southwardly along the basin of the Boeuf River to the backwater area of the Red River in the State of Louisiana. The source of this floodway, as planned, extended along the levee on the west side of the Mississippi River from Rohwer to Luna Landing, a distance of thirty miles.

"The essential features of the proposed floodway, as they were set forth in the plan adopted, were (1) a section of the riverside levee at Cypress Creek, designated a fuse plug, across the upper end of the floodway, of less height than the contiguous levee, or the levee on the opposite side of the river; this was to be provided by leaving intact and unaltered the then existing riverside levee, built and maintained at the 1914 grade and section, as established by the Mississippi River Commission. The grade of this fuse plug section was equivalent to 60.5 feet on the gauge at Arkansas City. When the river reached that stage, the water would run over the levee and into the floodway. (2) The grade of the riverside levees above and below the fuse plug section, as well as that on the east side of the river, was to be raised three feet, to effect the entry of excess flood water into the floodway. (3) A system of guide levees, on the east and the west side of the floodway to hold the water in the designated channel, and prevent it from spreading out on the lands on either side."

Appellants claim that a servitude was impressed upon plaintiff Sponenbarger's property equivalent to a taking thereof by the enactment of the Flood Control Act of May 15, 1928, and by "The adoption of a program, and the assumption by the government of the control of the fuse plug section, because of which, it is claimed, the plaintiff is deprived of the right of 'self defense' against a threatened flood, and her land decreased in market value;" also by "The act of the government in raising the levee above, below and across the river from the Cypress Creek gap, thereby making it certain that in the event of a flood which the levee would not withstand, plaintiff's land would be covered with water".

The substantial defense interposed by the United States is thus stated by the trial court: "The answer of defendant asserted (1) that the enactment of the Flood Control Act created no express or implied obligation to compensate plaintiff, or that any act of the Government done under authority of the said statute con-

stituted a taking of plaintiff's property; and (2) that the Boeuf Floodway had by a subsequent Act of Congress been abandoned and the Eudora Floodway substituted in lieu thereof."

It thus becomes important to examine House Document No. 90 to ascertain the essential features of the Jadwin Plan which, as Attorney General Mitchell convincingly holds, is the fixed legal project to be executed in accordance with law. The practical limits of this opinion forbid more than quotation sufficient to disclose the essential features of this controlling plan and the grounds for their insistence.

From Section 3. "The recommended plan fundamentally differs from the present project in that it limits the amount of flood water carried in the main river to its safe capacity, and sends the surplus water through lateral floodways." Floodways from the Arkansas River through the Tensas Basin to the Red River to relieve the main channel of the water it cannot carry and to protect the general levees is pronounced an "essential feature" of the plan.

From Section 7. "Man must not try to restrict the Mississippi River too much in extreme floods. * * * The water which cannot be carried in the main channel with the levee at reasonable height must be diverted and carried laterally. * * * As a general setback is not practicable the remainder must be supplied by floodways paralleling the general course of the river." In that way the waters of a flood of great magnitude, such as that of 1927, would be passed out to the Gulf "without danger to life in the alluvial valley, and without damage to property except in the floodways allotted for its passage". (From Section 8.)

From Section 16. "From the mouth of the Arkansas to the Old River, at the mouth of the Red, extreme floods cannot be carried between levees of the Mississippi without dangerous increase in their heights. A flood way for excess floods is provided down to the Boeuf River, on the west side of the river. * * * The entrance to the flood way is closed by a safety plug section of the levee, at present grade, which is located at Cypress Creek, near the mouth of the Arkansas. To insure their safety until this section opens, the levees of the Mississippi, from the Arkansas to the Red, will be raised about 3 feet. To prevent flood waters from entering the Tensas Basin, except through the flood way during high floods, the levees on the south side of the Arkansas will be strengthened and raised about 3 feet as far upstream as necessary."

From Section 17. "The section at the head of the flood way will protect the land within the flood-way levees against any flood up to one of the magnitude of the 1922 flood. A flood of a magnitude somewhere between that of 1922 and of 1927 will break it, turning the excess water down the flood way, which will carry it safely to the backwater area at the mouth of the Red river."

From Section 119. "The Boeuf River bottom is selected for this diversion because it is the most suitably located to receive the water, is the most direct route, has the best width, and covers largely undeveloped swamp land."

From Section 120. "The United States must have control over the Cypress Creek levee and keep it substantially at its present strength and present height."

From Section 121. "The remainder of the alluvial valley, on each side of this stretch of the river, barring accident, will have complete protection from all possible floods."

The average height that other levees are to be raised is approximately three and one-half feet. The Cypress Creek levee is to remain at the 1914, or present, level. Levees generally were to be constructed where necessary to prevent the flood-water of any one of the great basins from flowing into the basin below it "except through the relief or fuse plug levees intended to carry off the excess waters during high floods".

From Section 140. "Since the protection and preservation of the flood-discharge capacity of the alluvial valley of the Mississippi River is requisite to the common welfare of the Nation and to the preservation of the many lines of interstate commerce which cross the valley, it should be protected and preserved by similar legislation. The warning can not be too strongly emphasized that unless the flood-discharge capacity provided in the plan herein recommended is preserved, a future great flood will result in a disaster as great as or greater than that experienced this year."

The importance of the Mississippi River and the damage of its floods to the

general welfare is thus stated in various sections of the Jadwin Plan:

"The Mississippi River is the world's greatest river, combines size with usefulness, and is one of the grandest and most valuable assets of the United States."

"Through its aid to drainage, navigation, water supply, power, manufacturing, agriculture, and other incidental uses, it renders vital service to over 40 per cent of the area of the country. Its waters come from 31 States, and, were it not for the levees, would in flood cover 30,000 square miles, a territory greater than many of our States."

"Its alluvial valley has a growing population and contains the largest area of the richest land in the United States."

"Its worst characteristic is that its floods inflict at times great damage upon the people and property in the alluvial valley of the lower river. They take their toll in life and in damage to property, affecting the inhabitants of the valley and investors, manufacturers, and consumers throughout the country. They interfere with the food supply and the general welfare of the country, with its postal service and transcontinental and other interstate commerce."

From the foregoing it will be seen that the essential feature of the Jadwin project, as distinguished from previous plans and practices, is the diversion of flood waters from the main river channel, and their discharge through established floodways of which the Boeuf Floodway is one. By this means it is expected that at least 20,550 square miles of the 30,000 square miles of the alluvial valley will be protected annually, "without damage to property except in the floodways". "The levees generally will be raised about three feet, so that the selected weaker relief levees will be at about the elevation of the present (1914) levee top, and will surely serve their purpose." The control of the Mississippi River by levees alone is found to be impracticable. It appears beyond question that the Boeuf Floodway is a planned floodway; that the Congress has created and established such floodways in the exercise of its power over transcontinental and other interstate commerce, and its conceded right to protect the general public in matters so closely related to the general welfare.

The plan, adopted by the Congress as a fixed project in all its essential features, provides that the United States must have control of the Cypress Creek levee and keep it at its (then) present strength and height. Without question in the passage of this Act, Congress has assumed control of this fuse plug, and, by entering a field within its jurisdiction, has excluded all local interference with its national powers. The contention of counsel for appellants is that the restriction of this fuse plug levee to its 1914 strength and height, while other levees, especially above and below on the west side of the river, and those on the east side of the river are raised in height, throws an additional burden upon the Cypress Creek levee protecting lands lying in the Boeuf River bottom. The plan is to direct excessive flood waters into this floodway, thereby lowering the safety and protection of these lands as compared with others situated in this same section of the alluvial valley. In fact the frankly stated object of the Jadwin plan is to protect more than two-thirds of the valley at the expense of potential damage to property in the floodways in the event of excessive floods. Such discrimination is wanting in the absence of government control of levees, and in the existence of local responsibility for levee or other flood protection.

It will be recalled that Section 3 of the Act (33 U.S.C.A. § 702c) provides that "no liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place"; but Section 4 (33 U.S.C.A. § 702d) directs that the United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the river, and the Secretary of War may cause proceedings to be instituted for the acquirement by condemnation of lands, easements, or rights of way. These two sections are entirely consistent. Appellant Sponenbarger claims that a servitude has been placed upon her land by the creation of this essential floodway in which the land is situated. That the diversion from the main channel of the river is now a fixed fact in case of excessive floods, instead of a casual and incidental happening in case of local responsibility, now placed beyond her control by virtue of the Act of May 15, 1928.

It is true that the Boeuf River Basin has been flooded occasionally in past years. So, likewise, have other lands in this sec-

tion of the alluvial valley now sought to be comparatively, if not absolutely, protected by the Jadwin plan. But now it is legislatively declared that the lands in the Boeuf Floodway must necessarily be flooded by diversion of waters from the main channel in case of the excessive floods feared and in contemplation by this Flood Control Act. The United States has not caused proceedings to be instituted for the acquirement of such flowage rights or easements, and appellant · claims that the market value of her land has been greatly impaired by the cloud and servitude thus cast upon it, and that this constitutes a taking within the meaning of the Tucker Act. Of course, it is not contended that the land is actually physically appropriated, and all citations purporting to deal with such a situation are largely, if not entirely, beside the point.

█ "The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment [U.S.C.A.Const.]. Statutory recognition was not necessary. A promise to pay was not necessary." Jacobs v. United States, 290 U.S. 13, 16, 54 S.Ct. 26, 27, 78 L.Ed. 142, 96 A.L.R. 1.

██ The appropriation of private property for a public use requires the return of a full and exact equivalent to the owner. That equivalent in case of complete appropriation is the market value of the property at the time of the taking, contemporaneously paid in money. In case an easement only is impressed and taken, the rule is to determine the fair market value before the easement is imposed, next to find that value after the taking, and the difference is the amount of liability. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236.

In Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637, an owner of land within the proposed channel of the Boeuf Floodway, part of the plan now under consideration, brought suit to enjoin the carrying out of the work in the floodway without proceedings first having been instituted to condemn his land or the flowage rights thereon. The District Court of the Western District of Louisiana, held that a right of action was alleged, and granted the injunction prayed. (Kincaid v. U. S., 35 F.2d 235, and 37 F.2d 602). The latter

decree was affirmed by the Court of Appeals for the Fifth Circuit. United States v. Kincaid, 49 F.2d 768. The Supreme Court, in reversing the case, had no occasion to determine, nor did it determine, any of the controverted issues of fact or propositions of substantial law, but said: "We may assume that, as charged, the mere adoption by Congress of a plan of flood control which involves an intentional, additional, occasional flooding of complainant's land constitutes a taking of it— as soon as the government begins to carry out the project authorized. [Citing, among other cases, United States v. Lynah, 188 U.S. 445, 469, 23 S.Ct. 349, 47 L.Ed. 539; United States v. Cress, 243 U.S. 316, 328, 37 S.Ct. 380, 61 L.Ed. 746; and Portsmouth Harbor Land & Hotel Co. v. United States, 260 U.S. 327, 329, 43 S.Ct. 135, 67 L.Ed. 287.] If that which has been done, or is contemplated, does constitute such a taking, the complainant can recover just compensation under the Tucker Act (24 Stat. 505) in an action at law as upon an implied contract." Hurley v. Kincaid, 285 U.S. loc. cit. 103, 104, 52 S.Ct. loc. cit. 269.

In United States v. Lynah, supra, it is said: "It would be a very curious and unsatisfactory result, if in construing a provision of constitutional law * * * it shall be held that if the government refrains from the absolute conversion of real property to the uses of the public, it can destroy its value entirely, can inflict irreparable and permanent injury to any extent; can, in effect, subject it to a total destruction without making any compensation, because, in the narrowest sense of that word, it is not taken for the public use." (loc. cit. 469, 23 S.Ct. loc. cit. 356).

In United States v. Cress, supra, (loc. cit. 328, 37 S.Ct. loc. cit. 385) it is said: "There is no difference of kind, but only of degree, between a permanent condition of continual overflow by backwater and a permanent liability to intermittent but inevitably recurring overflows."

And in Portsmouth Harbor Land & Hotel Company v. United States, cited above, it is held that "where acts amount to a taking of property by the United States, without assertion of an adverse right, a contract to pay may be implied whether it was thought of or not". But in this case, as we have seen, the purpose to pay was not only thought of, but expressly contemplated. In Sanguinetti v.

United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608, liability of the United States ex contractu was denied where "it did not appear either that the flooding was intended or anticipated by the Government or its officers, or that it was attributable directly, in whole or in part, to the improvement, rather than to natural conditions". Such holdings are to be found in cases involving improvements to navigation, subject to the absolute power of Congress, where the flooding resulting is in its nature indirect and consequential instead of the direct objective of the Congressional Act. Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063.

■ In the instant case the government has not merely begun to carry out the project authorized by the Act of May 15, 1928. The essential features of the Boeuf Floodway as contemplated by the Act and by House Document No. 90 have been established for several years. The Floodway stands ready to carry off the excess waters of major floods in accordance with the provisions of that legislation. Obviously the omission of immaterial details could not affect efficient operation of this essential feature of the flood control plan. The testimony is that at the time this suit was filed in 1934 this plan was at least 80 per cent complete. The United States began actual construction of this project under the Flood Control Act in January, 1929. The so-called incomplete feature of the plan represents the failure to build the guide levees intended to limit the width of the floodways in the Boeuf and Atchafalaya Basins. Accordingly expert engineering witnesses testify that the Boeuf Floodway was 90 per cent complete when this suit was tried in the district court. The trial court was of opinion that the fact that sections of the levee, both at the lower and upper ends of the fuse plug proper, were also left temporarily at the 1914 grade gives to plaintiff's land the same levee protection "as all other alluvial lands in that section". To this we cannot agree. Section 1 of the Act (33 U.S.C.A. § 702a) provides that "pending completion of any floodway, spillway or diversion channel, the areas within the same shall be given the same degree of protection as is afforded by levees *on the west side* of the river contiguous to the levee at the head of said floodway [the fuse plug proper], but noth-

ing shall prevent, postpone, delay, or in anywise interfere with the execution of that part of the project *on the east side* of the river, including raising, strengthening, and enlarging the levees *on the east side* of the river". (Italics supplied.) This comprehensive plan binds together the lands on both sides of the river as parts of the same section of the alluvial valley. The temporary retention of the 1914 grade for a small space on each side of the fuse plug proper, but serves temporarily to enlarge that fuse plug. This entire section would go with any excessive flood that required diversion from the main channel as planned; and the plan provides that this fuse plug shall be "blown", or crevassed, if that is found necessary to facilitate and hasten diversion.

The guide levees within the Boeuf basin were not necessary to this essential feature of the project. They would serve merely to limit the quantity of the lands subject to diversion overflow. But the Sponenbarger land is menaced in either case. The presence of these guide levees would in no sense lessen the probability or possibility of a destructive crevasse at the Cypress Creek levee.

It is next urged that the Boeuf Floodway has, by a subsequent Act of Congress, been abandoned, and the Eudora Floodway substituted in lieu thereof. The Act of June 15, 1936 (33 U.S.C.A. § 702a-1 et seq.) did provide for a modification of the 1928 Act, and the construction of what was described as the Eudora Floodway. As stated by the trial court, "its general course is much the same as the Boeuf Basin, but it clings closer to the west bank of the Mississippi". It contains little more than one-half the total acreage of the Boeuf Basin, but in it equally lies the Sponenbarger land. The Act of 1936 (§ 2, 33 U.S.C.A. § 702a-2) provides that the Boeuf Floodway shall be abandoned as soon as the Eudora Floodway is in operative condition. Not only is the Eudora Floodway not in operative condition, but its ultimate construction is now regarded as extremely doubtful, owing to apparently irreconcilable disagreements between the government and local authorities over the terms of acquiring flowage easements.

At any rate the Boeuf Floodway is, and is recognized to be, in operative existence, and stands ready to discharge its functions planned in case of excessive flood. It is true that the Boeuf Basin has,

513

like other parts of this alluvial section, been subject to occasional overflow. At times, like such other parts, it has escaped. By the provisions of this plan of flood control it is subjected to a planned and practically certain overflow in case of the major floods contemplated and described. No one can foretell when such may occur, but that is the only remaining uncertainty in the premises. If, and when, such floods do occur, serious destruction must be conceded. So considered, a reasonable construction of Section 4 of the Act of May 15, 1928 (33 U.S.C.A. § 702d), must regard such as the "additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River", for which the United States shall provide flowage rights (Section 4, Act May 15, 1928). The fuse plug levee is the "spillway" of which the Act speaks, and the "floodway" is the path of the flood within the Boeuf Basin.

It is true that the mere raising of levees on one side of a river is not, in effect, the taking of land on the other side. Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363. That case involved works constructed for the benefit of navigation, and the damages involved were therefore held to be remote and consequential. The United States had adopted no comprehensive plan for flood control; consequently it was held not to be responsible for damages resulting from overflow, or for failure to construct additional levees along the Mississippi River valley to afford protection from increased overflow caused by levees constructed at other points by state and federal authority.

The Mercantile-Commerce Bank and Trust Company, Mercantile-Commerce National Bank, and St. Louis Union Trust Company, appellants, were joined as additional parties plaintiff on motion of defendant. They appear as lien claimants who are trustees for the local Arkansas Levee District, and for the bondholders thereof under bond pledge agreements. They favor the recovery of compensation, but insist that, as such trustees, they should participate in any action which seeks to fix the total amount thereof, or which seeks to determine the interest of any particular party therein. The truly critical issue, as stated in their briefs, very well summarizes what has already been said: "The Government has deprived the Boeuf

Basin landowners of property, to-wit: Of certain of the attributes of their property rights in the land in the Boeuf Basin, by designing and constructing a levee system deliberately intended to sacrifice the Boeuf Basin lands for the benefit of a much larger group and for the public good and, among other things, has deprived the Boeuf River landowners of that particular attribute of their property which consisted of their common-law right to protect their lands against floods by raising and strengthening their protective levees and by giving the Government the right to sacrifice even the existing levees when necessary to accomplish the general purpose. The lien claimants are not contesting the wisdom of the plan nor the right of the government to adopt it, but are only insisting that the few who are sacrificed for the benefit of the many be compensated either by the many or at public expense."

The trial court, having found against appellant Sponenbarger, said: "In view of this conclusion it is not conceived to be necessary to make any findings as to the interveners."

We have given very careful consideration to this record and to the able and painstaking analysis of the learned trial judge in findings and opinion. We find ourselves unable to concur in the conclusion that no recovery against the government can result from the easement appropriated and the servitude that has been impressed upon the land of appellant Sponenbarger. The fact that the ascertainment of just and adequate compensation will not be a simple matter in view of the complexity of the elements that are said to enter into and condition the computation, cannot be permitted to interfere with the constitutional rights of the parties.

Our conclusion is that the judgment must be reversed, and the cause remanded to the district court for further proceedings not inconsistent with the views herein expressed.

WOODROUGH, Circuit Judge (dissenting).

I dissent because it has appeared to me that the judgment of the trial court ought to be affirmed on the grounds set forth in its opinion.