HURLEY, SECRETARY OF WAR, *v.* KINCAID.

No. '457.   Argued January 4, 5, 1932.—Decided February 23, 1932.

*Solicitor General Thacher,* with whom *Assistant Attorney General Richardson* and *Messrs. G. A. Iverson* and *Paul D. Miller* were on the brief, for petitioners.

*Messrs. Wm. C. Dufour* and *Harry H. Russell,* with whom *Messrs. T. J. Freeman, John St. Paul, Jr.,* and *G. L. Porterie* were on the brief, for respondent.

98

Mr. Justice Brandeis delivered the opinion of the Court.

On June 15, 1929, Kincaid brought this suit in the federal court for western Louisiana against the United States, the Secretary of War, the Chief of Engineers, the Mississippi River Commission and its members, to enjoin the carrying out of any work in the Boeuf Floodway under the Mississippi River Flood Control Act, May 15, 1928, c. 569, 45 Stat. 534, and specifically to enjoin the receiving of bids and awarding of contracts for the construction of certain guide-levees bounding the Floodway.

The Mississippi River Flood Control Act adopted the Jadwin Plan for protection against floods. The Act provides for raising the levees generally three feet; for improving the carrying capacity of the main channel of the river by revetment work; and for limiting the flood-waters in this channel to its safe capacity through the provision of specified diversion channels. Among these is the Boeuf Floodway, which will carry excess flood-waters from a point below the mouth of the Arkansas through the Boeuf Basin west of the Mississippi into the backwater area at the mouth of the Red River. Such diversion has taken place to some extent in the past, when flood-waters have passed over, or through crevasses in, the twenty mile section of the levee at the head of the Basin, known as the Cypress Creek levee. Before

this section was completed, in 1921, the Boeuf Basin and the parallel Tensas Basin, lying between it and the main channel, served as natural overflow areas of the Mississippi in flood periods. The Plan leaves the Cypress Creek section at its present height. But as the levees elsewhere are to be raised three feet and materially strengthened, preventing overflow at other points, the volume of water passing into the diversion channel may be greatly increased. Moreover, guide, or protection, levees running in a southerly direction are to be built on either side of the Floodway, which will direct the waters into a specified channel of a width varying from ten to twenty miles; and new levees are to be constructed which will cause this Floodway to carry waters formerly overflowing into the Tensas Basin. The maximum previous flow of water into the Boeuf Basin occurred in 1927, and is estimated at 450,000 cubic feet per second. Under the new Plan the flow may reach 1,250,000 feet per second in times of extraordinary flood. The War Department advertised for bids for the construction of guide-levees for the Boeuf Floodway, to be received June 17, 1929. To complete the project will probably require ten years.

Kincaid owns a 160-acre farm in the Boeuf Basin at a point 125 miles below the point of diversion. No part of the guide-levees is to be built on his land; but the land lies within the proposed channel of the Floodway. He alleges that the project will expose his property to additional destructive floods and thus subject it to a new servitude; that the mere " setting apart [of] this property as a flood way and diversion channel and . . . advertising for and receiving bids for . . . construction of the guide levees " casts a cloud upon his title;[1] and that the Government is proposing to com-

---

[1] The allegation is: " That the acts of the defendants in setting apart this property as a floodway and diversion channel and in advertising for and receiving bids for the doing of the proposed work, to wit, the construction of the guide levees and the contemplated acts

mence the work without having instituted condemnation proceedings. He charges that the acts of the defendants in advertising for bids for the construction of the guide-levees, to be followed by the letting of contracts, without having taken proceedings to condemn his land, " will mean the taking by the United States Government of complainant's lands and properties without due process of law and without just compensation."

All the defendants moved to dismiss the bill on the grounds, among others, that the United States had not consented to be sued, and that the bill disclosed no ground for equitable relief. The District Court held that the United States could not be made a party, since it had not consented to be sued; but overruled the motion to dismiss the suit, on the ground that the United States was not an indispensable party; that § 4 of the Act declares that " the United States shall provide flowage rights for additional destructive flood waters that will

---

of the defendants in the awarding of contracts therefore [sic], have already had the effect of casting a cloud upon the title of complainant to his said lands and properties and have materially affected his use and enjoyment of same and have materially affected and impaired the value thereof. That, [as] the result of setting apart this area as a floodway or diversion channel and the publication by defendants of said advertisements for bids for the construction of the guide levees, this property has not only deteriorated in value but complainant's title to same has been seriously clouded, his use of same has been seriously affected, and complainant would be unable to borrow money on said lands, sell or dispose of same, or interest persons in operating said lands for farms or for any other purposes, owing to the fact that the Government has indicated that it has taken possession or intends to take immediate possession of this property for a diversion channel or a floodway. That, as a result of making this area, in which complainant's lands and those of others are situated, a floodway or diversion channel, these lands will be rendered unfit for agricultural or any other purpose. That the title to complainant's lands is seriously clouded by said acts, and his ability to use said properties or obtain credit thereon is seriously affected, and, as stated above, this property is well worth the sum of $9,000.00."

pass by reason of diversion from the main channel of the Mississippi River";[2] that, on the allegations of the bill, the creation of the Boeuf Floodway would subject Kincaid's land to additional destructive flood-waters; that the Act required the Government to condemn, or otherwise to acquire flowage rights over, the property before proceeding with the flood-control project in the Boeuf Basin; and that, by starting work before acquiring such rights, the defendants were proceeding in violation of both the Act and the Constitution. 35 F. (2d) 235.

Thereupon an answer was filed and the case was heard on evidence on final hearing. The defendants showed

[2] The following are the provisions of the Act relevant to the payment of damages and of compensation for the taking of land.

" Sec. 3. . . . No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place: *Provided, however,* That if in carrying out the purposes of this Act it shall be found that upon any stretch of the banks of the Mississippi River it is impracticable to construct levees, either because such construction is not economically justified or because such construction would unreasonably restrict the flood channel, and lands in such stretch of the river are subjected to overflow and damage which are not now overflowed or damaged by reason of the construction of levees on the opposite banks of the river it shall be the duty of the Secretary of War and the Chief of Engineers to institute proceedings on behalf of the United States Government to acquire either the absolute ownership of the lands so subjected to overflow and damage or floodage rights over such lands.

" Sec. 4. The United States shall provide flowage rights for additional destructive flood waters that will pass by reason of diversions from the main channel of the Mississippi River. . . .

" The Secretary of War may cause proceedings to be instituted for the acquirement by condemnation of any lands, easements, or rights of way which, in the opinion of the Secretary of War and the Chief of Engineers, are needed in carrying out this project, the said proceedings to be instituted in the United States district court for the district in which the land, easement, or right of way is located. . . . The provisions of sections 5 and 6 of the River and Harbor Act of July 18, 1918, are hereby made applicable to the acquisition of lands, easements, or rights of way needed for works of flood control. . . .

that, in the opinion of the Secretary of War and the Chief of Engineers, it was unnecessary to acquire any flowage rights over complainant's lands; insisted that these lands would be better protected under the Plan than heretofore; and claimed that § 4 of the Act was not applicable, because the Plan would not subject the property to " additional destructive flood waters." The District Court found on these issues against the Government; held that upon the evidence the Plan involved a taking of rights in respect to Kincaid's land; and that although the physical occupancy of it would not occur until the land had been overflowed in time of flood, " the process of subjecting it to that service and the taking possession in so far as is either necessary or contemplated by the act will begin with the construction of the first levee or works which are intended to direct the water upon the land." It enjoined the defendants, other than the United States, " from proceeding with the construction authorized by or carrying out the plan adopted by . . . the Mississippi River flood-control act in the Boeuf Basin flood way, . . . until the property of the said complainant has been acquired by the United States Government or the flowage rights over the same acquired either by purchase or condemnation for such purpose." 37 F. (2d) 602. The Circuit Court of Appeals affirmed the judgment of the District Court. 49 F. (2d) 768. This Court granted a writ of certiorari.

We have no occasion to determine any of the controverted issues of fact or any of the propositions of substantive law which have been argued. Kincaid concedes that the Act is valid and that it authorizes those entrusted with its execution to take his lands or an easement therein. We may assume that, as charged, the mere adoption by Congress of a plan of flood control which involves an intentional, additional, occasional flooding of complainant's land constitutes a taking of it—as soon as the Government

begins to carry out the project authorized. Compare *United States* v. *Lynah*, 188 U. S. 445, 469; *United States* v. *Cress*, 243 U. S. 316, 328; *Peabody* v. *United States*, 231 U. S. 530, 538; *Portsmouth Harbor Land & Hotel Co.* v. *United States*, 250 U. S. 1; 260 U. S. 327, 329. If that which has been done, or is contemplated, does constitute such a taking, the complainant can recover just compensation under the Tucker Act in an action at law as upon an implied contract, since the validity of the Act and the authority of the defendants are conceded. *United States* v. *Great Falls Mfg. Co.*, 112 U. S. 645, 658; *Great Falls Mfg. Co.* v. *Attorney General*, 124 U. S. 581, 600; *Tempel* v. *United States*, 248 U. S. 121, 129; *Marion & Rye Valley Ry. Co.* v. *United States*, 270 U. S. 280, 283. The compensation which he may obtain in such a proceeding will be the same as that which he might have been awarded had the defendants instituted the condemnation proceedings which it is contended the statute requires. Nor is it material to inquire now whether the statute does so require. For even if the defendants are acting illegally, under the Act, in threatening to proceed without first acquiring flowage rights over the complainant's lands, the illegality, on complainant's own contention, is confined to the failure to compensate him for the taking, and affords no basis for an injunction if such compensation may be procured in an action at law.[3] The Fifth Amendment does not entitle him to be paid in advance of the taking. *Crozier* v. *Krupp*, 224 U. S. 290, 306. Compare *Backus* v. *Fort Street Union Depot Co.*, 169 U. S. 557, 568; *Bragg*

---

[3] Even where the remedy at law is less clear and adequate, where large public interests are concerned and the issuance of an injunction may seriously embarrass the accomplishment of important governmental ends, a court of equity acts with caution and only upon clear showing that its intervention is necessary in order to prevent an irreparable injury. Compare *Osborne* v. *Missouri Pacific Ry. Co.*, 147 U. S. 248, 258, 259; *New York City* v. *Pine*, 185 U. S. 93, 97. No such showing was made here.

v. *Weaver,* 251 U. S. 57, 62; *Joslin Mfg. Co. v. City of Providence,* 262 U. S. 668, 677; *Dohany* v. *Rogers,* 281 U. S. 362, 366.[4]

As the complainant has a plain, adequate and complete remedy at law, the judgment is reversed with direction to dismiss the bill without prejudice.

*Reversed.*

---

[4] See also *Cherokee Nation* v. *Southern Kansas Ry. Co.,* 135 U. S. 641, 659; *Sweet* v. *Rechel,* 159 U. S. 380, 400, 407; *Adirondack Ry. Co.* v. *New York,* 176 U. S. 335, 349; *Williams* v. *Parker,* 188 U. S. 491, 502, 503; *Manigault* v. *Springs,* 199 U. S. 473, 485, 486; *Hays* v. *Port of Seattle,* 251 U. S. 233, 238.