**GOODMAN et al. v. UNITED STATES.**
**No. 417.**

District Court, S. D. Iowa, W. D.
July 27, 1939.

George H. Mayne and George H. Mayne, II, both of Council Bluffs, Iowa, for plaintiffs.

John K. Valentine, U. S. Atty., of Centerville, Iowa, Cloid I. Level, Asst. U. S. Atty., of Denison, Iowa, Wm. R. Sheridan, Asst. U. S. Atty., of Keokuk, Iowa, and Tom DeWolfe, Sp. Asst. to Atty. Gen., for the United States.

DEWEY, District Judge.

This action came on for hearing at Council Bluffs, Iowa, on its merits on June 27, 1939, and the taking of evidence was ended on the first day of July, 1939, arguments had and the action submitted.

The action is brought under the provisions of the Tucker Act, Section 41 (20), Title 28, U.S.C., 28 U.S.C.A. § 41 (20), allegedly for unliquidated damages in a case not sounding in tort.

I find the facts the following:
As to Count I.

1. That plaintiff, Ralph G. Goodman, is now and has been since 1926 the owner of the following described land, to-wit: "East half of the Southeast quarter of Section 19; All that part of the Southwest Quarter of the Northwest Quarter of Section 20 lying West of the right-of-way of the Kansas City, St. Joseph & Council Bluffs Railroad; and all that part of the northwest quarter of the southwest quarter of said Section 20 lying west of the aforesaid right-of-way and north of the public road, all in Township 73, Range 43, in Mills county Iowa.", subject to a mortgage to plaintiff Jessie McEllrath as set out in the second amendment to the petition, and that said plaintiff Ralph G. Goodman is and has been since 1930 the owner of the following described land, to-wit: "The Southeast quarter of the Northeast quarter of Section 19, Township 73, Range 43, Mills county, Iowa.", under real estate contract with plaintiff George H. Mayne, and that said land is located as shown by Exhibit A.

2. That the Missouri River is a navigable stream which, during the months of March, April, May, June and July, of each year carries a large amount of flood water coming into the drainage area of said river from above the lands of plaintiff, and that prior to the initiation of the river improvements hereinafter referred to, said river had cut out and flowed through a broad channel with a capacity sufficient to carry the ordinary high water of said river, and that all of the land of plaintiff, above described, was, prior to the doing of the work hereinafter described, above the ordinary high water mark of said river and free from overflow except from extraordinary floods.

3. That by the Acts of Congress as set out in Exhibit 1, a plan as shown by House Documents 1120 and 238, being Exhibits 2 and 3, was adopted for the purpose of creating a navigable channel for said Missouri river between Kansas City, Missouri, and Sioux City, Iowa, and appropriations made by Congress for the prosecution of said plan, and that all of the work done in the vicinity of the land of plaintiff was done under the direction of the Secretary of War and the supervision of the engineers of the War Department in accordance with the aforesaid plan. That the plan adopted by Congress as aforesaid provided for the establishing and location of a permanent channel, the changing of the natural channel to conform to the location of the permanent channel provided for in said plans, and the narrowing of the natural channel to conform to the width established and fixed for the permanent channel in conformity with the plans adopted, and that appropriations were made from time to time by Congress for the doing of the work under said plans.

4. That prior to June 25, 1937, and in the carrying out of said plans of the War Department, the work was done in the vicinity of the land of plaintiff as shown by Exhibits B and C, and that in carrying out said work pile dikes were constructed six or seven feet above the ordinary level of said river for the purpose of changing the current of said river and causing and bringing about a sedimentation above and below said pile dikes, and that as the result of the construction of said pile dikes, a sedimentation resulted causing a filling in by silt and sediment to the top of many of said pile dikes, and that one purpose of the construction of said dikes was to cause such sedimentation.

5. That an extraordinary flood occurred on the Missouri river in May, 1927, with the highest flood level since the year 1881, and excepting the flood of 1881, the highest flood level of the river since 1872, as shown by Government Exhibit 31, and

the maximum discharge at Omaha at the time of said flood of 1927 was in excess of 250,000 per second cubic feet. That the maximum discharge at Omaha at the time of the highest water on April 6, 1939, was 140,000 per second cubic feet, and for the years 1937 and 1938 the maximum discharge at the time of the highest water was substantially less than 140,000 per second cubic feet, but on the land of plaintiffs the flood level was approximately ten inches lower in 1927 than it was in 1937, 1938 and 1939. That the maximum discharge at Omaha at the time of the highest water in the year 1932 was substantially the same as the maximum discharge at Omaha at the time of the highest water in the year 1938, but in 1938 the flood level was 4.4 feet higher at the land of plaintiffs than in 1932. That there are no tributaries of the Missouri River flowing into said river between Omaha and the land in question which could appreciably increase the volumes of water in said river, and the evidence shows that there was no substantial change in the carrying capacity of the flood water channel in said river between the year 1932 and the time when said government work was commenced.

6. That said pile dikes as shown by Exhibits B and C were constructed in the flood water channel of the Missouri River and that prior to June 25, 1937, as the direct result of the construction of said pile dikes and the sedimentation resulting therefrom, the ordinary high water channel of said river immediately above and through St. Mary's Bend was obstructed and the carrying capacity thereof reduced, thereby causing the flood waters of the river on or about June 25, 1937, and on or about July 12, 1938, and on or about April 6, 1939, to be raised above St. Mary's Bend to a level in excess of three feet above what it would have been had said government work not been done, and that said increase in the flood levels of said river caused and resulted in the overflow of a large proportion of plaintiff's land during said years of 1937, 1938, and 1939, and that but for said government work said overflow would not have occurred.

7. That it is to be reasonably anticipated that the government work in said vicinity as it now exists will cause a future flooding of plaintiff's land in time of ordinary floods in said river.

8. The exact boundaries of the overflow in the year 1937, and which are substantially the same in the years of 1938 and 1939, are shown upon the Government's plat, Exhibit No. 20. This plat shows an overflow on all of the Mayne land except a ridge which runs north and south about in the center of the land, and includes all of the Goodman land, except a small portion upon the north edge thereof.

9. Just below the lands of the plaintiffs, the river in 1937 and prior thereto took a sharp bend to the east, and had formed a bend which is known in the record as St. Mary's Bend, and at the south end of this bend the river turns abruptly west.

10. As a result of the placing of these piling and revetments the water was held back and overflowed upon the Mayne land to a ridge which extended parallel with the river but was prevented from overflowing onto these lands by this ridge at that point, but as the flood waters continued on south and reached the end of St. Mary's Bend, and at a point where the ridge above referred to had ended, it flowed on easterly instead of following the natural channel of the river, into a lake, known in the record as Fulsom Lake, and then backed up on the east side of the ridge above referred to until it had covered all of that bottom land as shown by the plat Exhibit No. 20, including all of the Mayne land and all of the Goodman land except a small tract on the north edge thereof.

11. (1) That at St. Mary's Bend the Government in the year 1938 changed its plans and has constructed a channel across the neck of that bend and this new channel now carries one-half to two-thirds of the ordinary flow of the water.

(2) That the Government intends to control the flood waters originating in the headwaters of the Missouri River by the impounding of such waters in the reservoir created by the Fort Peck Dam in Montana, which is soon to be in operation.

12. In authorizing the work the Congress did not make any provision for the payment by reason of the taking or damages resulting from the overflow of the river caused by the work, which was intended solely to aid navigation, and no provision of the Act under which the work was done has been called to my attention, which would in any way indicate that there was any intention on the part of Congress to pay for land which was overflowed or

taken by reason of said overflow caused by the work.

13. That the river improvements and structures complained of herein have since the date of their construction been in the navigable channel of the Missouri river and were placed therein by the Government for the purpose of improving said river for navigation purposes, as authorized and directed by the Congress (69th Congress, Chapter 47, P. 1010, Jan. 21, 1927, H.R. 11616, and related acts); that said improvement structures consist of pile dikes and revetments, being the usual improvement structures used for the purpose of channel stabilization.

14. That the work is being done by officers of the engineering department of the United States Army and these officers do not believe that the overflow of the Missouri river in times of ordinary flood on plaintiffs' lands was the direct and proximate result of the improvements placed in the bed of the Missouri river and believe that such overflow will be reduced when the river improvement is completed.

15. That prior to the doing of said government work as hereinbefore set out the fair and reasonable value of plaintiff Goodman's land above described was the sum of $8800 and that the fair and reasonable value of Goodman's land since said work has been done is the sum of $4400 and that by reason of said work the fair and reasonable value of said land has been reduced the sum of $4400 and plaintiff Goodman has sustained damage in that amount.

### As to Count II.

1. That plaintiff George H. Mayne is now and has been since prior to the year 1921, the owner of the land described in Count II of the original petition herein, and that said land is subject to a mortgage to plaintiff Trustees of Iowa College, Grinnell, Iowa, as set out in the second amendment to petition, and that for the years 1937 and 1938 and prior thereto plaintiff Ralph G. Goodman leased said premises from plaintiff George H. Mayne.

I find the facts as set out in paragraphs 2 to 14 incl. above and the same are by reference incorporated herein.

15. That none of the land covered by the lease to plaintiff Ralph G. Goodman was overflowed by flood water from the Missouri River during the years 1921 to 1926 inclusive or during the years 1928 to 1934 inclusive or during the year 1936, and only a small amount of flood water in 1935, which came onto said land from above.

16. That in the year 1937 plaintiff R. G. Goodman, as tenant of plaintiff George H. Mayne, planted, sowed and had growing upon the leased premises crops substantially as set out in Count II of said original petition, and that during the months of June and July, 1937, the land on which said crops were growing was overflowed and the crops thereon damaged and destroyed and that the fair and reasonable value of the crops growing on said premises and destroyed by said overflow was the sum of $2500.

17. That in the year 1938 plaintiff R. G. Goodman, as tenant of plaintiff George H. Mayne, planted, sowed and had growing upon the leased premises crops substantially as set out in Count II of said original petition and that during the months of June and July 1938 the land on which said crops were growing was overflowed and the crops thereon damaged and destroyed and that the fair and reasonable value of the crops growing on said premises and destroyed by said overflow was the sum of $2300.00.

Plaintiffs' petition setting forth their claim that the overflow and damage to their lands constituted a taking of plaintiffs' property as provided in the 5th Amendment to the Constitution of the United States, U.S.C.A., is as follows: "That during the months of March, April, June and July in the years 1937 and 1938 at the time of ordinary flood water in said Missouri river, all of the land of this plaintiff was overflowed by said river, the crops growing thereon were totally destroyed and the land rendered unfit for use for agricultural purposes (Page 9 of Opinion) and that said land will, for an indefinite period in the future, be subjected to such overflow, and that such overflow is the direct and proximate result of the construction work in the natural channel and waterway of said river as instituted and carried on by the defendant in carrying out its plans under the provisions of the Acts of Congress relative thereto, and that the raise in the natural flood levels of said river was the proximate result of the construction work aforesaid, and that the doing of said construction work under said plans deprived this plaintiff of the ordinary use of said real estate and caused a partial destruction of the value thereof and thereby constituted a taking of plain-

tiff's property as provided and contemplated in the Fifth Amendment to the Constitution of the United States".

## Opinion

Plaintiffs' cause of action is in two counts. In the first count they claim that the flooding of the Goodman land deprived Goodman of the ordinary use thereof for agricultural purposes in the years 1937 and 1938 and constituted a partial taking of plaintiff Goodman's real estate.

In the second county they alleged that the overflow on the Mayne land destroyed the crops thereon for the crop years of 1937 and 1938, and the destruction of the crops constituted a taking for which the Government is responsible.

The answer sets out as affirmative defenses:

1st. That the plaintiffs have failed to state a claim upon which relief can be granted.

2nd. That the alleged destruction of the land of plaintiff Goodman was not a taking of said land by the United States within the purview of the 5th Amendment.

3rd. That any damage suffered by the plaintiffs is remote and of a consequential nature resulting from the work done.

4th. That by virtue of the paramount right of the United States in the interest of improvement of the Missouri river for the purposes of navigation, defendant never intended to take plaintiffs' property or any portion thereof.

■ The New Rules of Civil Practice provide in effect that pleading a failure to state a cause of action upon which relief can be granted may be made by answer or on motion. Rule 12 (b), 28 U.S.C.A. following section 723c.

This action is brought under the Tucker Act, the pertinent parts of which, as bearing upon the jurisdiction of this court over the subject matter, are as follows: "Concurrent with the Court of Claims, of all claims not exceeding $10,000 founded upon the Constitution of the United States or any law of Congress, or upon any regulation of an executive department, or upon any contract, express or implied, with the Government of the United States, or for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to which claims the party would be entitled to redress against the United States, either in a court of law, equity, or admiralty, if the United States were suable."

Plaintiffs say in argument that the Tucker Act is not limited to recovery on contracts, but includes claims "for damages, liquidated or unliquidated, in cases not sounding in tort, in respect to which claims the party would be entitled to redress against the United States * * * if the United States were suable."

From this I gather that plaintiffs contend that they may maintain this action for damages. They cite to maintain this position a district court case of Chappell v. United States, C.C., 34 F. 673, 674. But the Act expressly says that damages are so recoverable if the United States were suable and the action does not sound in tort.

■■ The Government is not suable for damages resulting from public works duly authorized, unless by express permission in some Act of Congress. And before there can be a suit based upon the provisions of the 5th Amendment to the Constitution, there must be an actual taking and recovery had as upon an express or implied contract to pay just compensation therefor, under the provisions of the Tucker Act.

In commenting upon the right of the Government to construct public works in a river for navigable purposes, the Supreme Court of the United States in the case of United States v. Cress, 243 U.S. 316, 326, 37 S.Ct. 380, 384, 61 L.Ed. 746, says: "But the authority to make such improvements is only a branch of the power to regulate interstate and foreign commerce * * * this power, like others, must be exercised, when private property is taken, in subordination to the 5th Amendment."

There is no claim in this case, nor can I find in the Act authorizing the work, any provision to pay for damages resulting from the work, or permission to sue the Government therefor.

■ A suit may be maintained therefore in this case and a recovery had of just compensation if there is plead and shown a taking of private property for public use within the meaning of the 5th Amendment, and under the Tucker Act authorizing such a suit in this court, in an action at law as upon an implied contract. Portsmouth Co. v. United States, 260 U.S. 327, 336, 43 S.

Ct. 135, 67 L.Ed. 287; Hurley v. Kincaid, 285 U.S. 95, 103, 104, 52 S.Ct. 267, 76 L.Ed. 637; United States v. C., B. & Q. R. R. Co., 8 Cir., 82 F.2d 131, 106 A.L.R. 942.

■ There is no allegation or proof that the crops were taken for any public use and no recovery can be had for this damage. Jackson v. United States, 230 U.S. 1, 8, 33 S.Ct. 1011, 57 L.Ed. 1363.

Plaintiffs' petition in effect alleges that as the natural consequences and proximate result of the work and construction in the river bed the water level was raised and flooded their lands, partially destroying the same and thereby took plaintiffs' property.

■ But considerably more must be alleged and proven to warrant a finding that the Government has taken plaintiffs' lands for a public use under an implied contract to pay therefor:

· 1st. The taking must be permanent. United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; United States v. Cress, 243 U.S. 316, 327, 37 S.Ct. 380, 61 L.Ed. 746.

2nd. The taking must be more than a damage. It must constitute a total destruction of the land, or a subservience of the land by the taking of flowage rights or easements.

As said in the case of United States v. Lynah, supra: "There have been many cases in which a distinction has been drawn between the taking of property for public uses and a consequential injury to such property, by reason of some public work. In the one class the law implies a contract, a promise to pay for the property taken * * * while in the other class, there is simply a tortious act doing injury, over which the court of claims has no jurisdiction." 188 U.S. page 472, 23 S.Ct. page 357, 47 L.Ed. 539.

3rd. There must be an implied agreement on the part of the Government to pay for the land taken before this court has jurisdiction under the Tucker Act.

■ Where a purpose to pay is expressly contemplated, it is sufficient. Sponenbarger v. United States, 8 Cir., 101 F.2d 506.

■ But in the absence of an express agreement or contemplation to pay there must be at least an implication that the Government will pay for the property taken. Judge Brandeis in the case of Portsmouth Co. v. United States, 260 U.S. 327,

331, 43 S.Ct. 135, 137, 67 L.Ed. 287, puts the rule broadly and generally, as follows: "Appropriation by the United States of private property for public use, without instituting condemnation proceedings, does not entitle the owner to sue under the Tucker Act * * * unless the taking was made under such circumstances as to give rise to a contract express or implied in fact to pay compensation." But if the circumstances show a contemplation by the government that land is or will be taken, or an intention, express or implied, to take the land, then the implied agreement to pay therefor must necessarily follow.

In the case of Christman v. United States, 7 Cir., 74 F.2d 112, 114, that court said, quoting from the Sanguinetti case, Sanguinetti v. United States: "It was not shown that the overflow was the direct or necessary result of the structure; nor that it was within the contemplation of or reasonably to be anticipated by government. [264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608.]"

And in Horstmann Co. v. United States, 257 U.S. 138, 146, 42 S.Ct. 58, 60, 66 L.Ed. 171, it is said that the damage there contemplated "could not have been foreseen or foretold * * * and necessarily there could not have been foresight of their destination [waters] nor purpose to appropriate the properties."

And in the case of Hurley v. Kincaid, 285 U.S. 95, 103, 52 S.Ct. 267, 269, 76 L. Ed. 637, it was said: "We may assume that, as charged, the mere adoption by Congress of a plan of flood control which involves an *intentional,* additional, occasional flooding of complainant's land constitutes a taking of it." (Our italics).

And even in cases where the Congress or the duly authorized officers have constructed a dam across a river or stream, it is held that there must at least have been in contemplation that damages would result therefrom and compensation would be payable. See Jacobs v. United States, 290 U. S. 13, 18, 54 S.Ct. 26, 78 L.Ed. 142.

In the case of United States v. Lynah, supra, 188 U.S. page 467, 23 S.Ct. 349, 47 L.Ed. 539, the court said that Congress knew this particular land would be damaged.

These cases but support the general rule that before there can be a taking under the Constitution and recovery thereof under the Tucker Act, there must at least be an implication that the Government knew

of and intended to take the land and to pay therefor. And this is necessarily so under the Tucker Act which provides that recovery in the courts may be had only, as shown above, where there is an actual or implied agreement.

In cases of dams in a river everyone knows that there must of necessity be continuously, or at times, a flooding of lands above the dam and that they will thus create a servitude upon such lands overflowed. In such cases it may be said that there was an intention to take the land, and, in the light of the 5th Amendment, an agreement to pay therefor. Pumpelly v. Green Bay Co., 80 U.S. 167, 13 Wall. 166, 167, 20 L.Ed. 557; United States v. Lynah, supra; United States v. Cress, 243 U.S. 316, 318, 37 S.Ct. 380, 61 L.Ed. 746; Jacobs v. United States, supra, and also in such cases as Portsmouth Co. v. United States, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287.

In the Portsmouth case, while it is said: "If the acts amounted to a taking * * * a contract would be implied whether it was thought of or not" (260 U.S. page 330, 43 S.Ct. page 137, 67 L.Ed. 287), the facts therein clearly indicate such a taking and the court comments as follows (260 U.S. page 329, 43 S.Ct. page 137, 67 L.Ed. 287): "If the United States, with the admitted intent to fire across the claimants' land at will should fire a single shot or put a fire control upon the land, it well might be that the taking of a right would be complete. But even when the intent thus to make use of the claimants' property is not admitted, while a single act may not be enough, a continuance of them in sufficient number and for a sufficient time may prove it. Every successive trespass adds to the force of the evidence. The establishment of a fire control is an indication of an abiding purpose."

From this it is apparent that if these floodings should continue, it might be that the time will come when there would be a clear indication of a purpose on the part of the Government to take these lands, and pay therefor.

On the other hand, there is a long line of authorities to the effect that where an improvement in the river is for the purpose of narrowing the river to create a constricted channel, or to otherwise improve navigation, the damages resulting from such work do not constitute a taking, but are consequential. Northern Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336; Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L. Ed. 1363; Hortsmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171; Sanguinetti v. United States, 264 U. S. 146, 44 S.Ct. 264, 68 L.Ed. 608; Hurley v. Kincaid, 285 U.S. 95, 103, 52 S.Ct. 267, 76 L.Ed. 637; Christman v. United States, 7 Cir., 74 F.2d 112; Franklin v. United States, 6 Cir., 101 F.2d 459; W. A. Ross Const. Co. v. Yearsley, 8 Cir., 103 F.2d 589.

In the Christman and Sanguinetti cases, supra, there was even the construction of a dam and yet the court determined that the damages were consequential.

It must be recalled that in the use of the term consequential damages the court had in mind any damage occasioned by public works that did not amount to a taking.

In the case of United States v. Chicago, B. & Q. R. Co., 8 Cir., 82 F.2d 131, 138, 106 A.L.R. 942, Judge Faris points out that many of the damages in the foregoing cases are not what is known to the law as consequential damages; and he comes to the conclusion that thus using the term "consequential damages" when they are direct damages are "to be allocated to the category of negligence and were torts and the Tucker Act was not applicable to them. This for the reason that the Tucker Act requires the presence of a contract express or implied."

■ With these fundamental rules as to what constitutes a taking by the government of the United States or private property for public use in mind, it is apparent that the plaintiffs have neither plead nor proven facts entitling them to recover.

The action is one in tort of which this court does not have jurisdiction under the Tucker Act.

I therefore find as conclusions of law:

1st. That plaintiffs have neither pled nor proven any situation from which could be deduced an intention to take plaintiffs' property or an implied agreement to pay therefor, and that there was not a taking within the meaning of the Constitution of either the lands or crops of the plaintiffs. And

2nd. That the action of the plaintiffs is for the recovery of consequential damages, sounds in tort, and should be dis-

missed on the ground that this court is without jurisdiction to hear and determine the same.

The Clerk will therefore enter the following order:

This suit having been tried in open court at Council Bluffs, Iowa, same was argued and submitted, and being advised.

The cause of action is dismissed solely on the ground that the court is without jurisdiction to entertain the same.

Plaintiffs except.