**CONNOR et al. v. SOUTH CAROLINA PUBLIC SERVICE AUTHORITY et al.**

**Civ. A. No. 2455.**

United States District Court
E. D. South Carolina.
Charleston Division.

June 15, 1950.

Savage & Marion, Camden, S. C., Moss & Moss, Orangeburg, S. C., for plaintiffs.

Robert McC. Figg, Jr., Charleston, S. C., T. B. Bryant, Jr., Orangeburg, S. C., W. D. Simpson, Moncks Corner, S. C., for defendants.

WARING, Chief Judge.

The Defendant South Carolina Public Service Authority was created by an act of the General Assembly of the State of South Carolina in 1934 which act will be found in the Code of Laws of South Carolina (1942), Sections 8555-11 to 8555-24, both inclusive. The two individual defendants are officers of the Authority. The Authority was created and given power to develop the Cooper, Santee, and Congaree Rivers as an instrumentality for commerce and navigation; to produce, distribute, and sell power; to reclaim low lands and reforest water sheds; together with various other necessary powers to exercise the foregoing general purposes. The specific project for which the Authority was created, was to erect a dam across the Santee River thereby impounding a large quantity of water in a reservoir or artificial lake; to construct a diversion canal to carry water from this lake to a basin situate near the head-waters of the Cooper, which basin was made by building additional dams and dikes; and the erection of a power house for the purpose of generation of hydro-electric power. The dams were to be constructed with locks so that navigation could be had from the Port of Charleston, up the Cooper River through canals and artificial lakes into the Santee River and thence through the Congaree River and eventually to the City of Columbia. The Authority was declared to be a "corporation completely owned by and to be operated for the profit of the people of South

Carolina". It was given power "to sue and be sued". The Authority has carried out these plans, and the plant is in operation.

The Plaintiffs in this cause, one a citizen of South Carolina and the other a non-resident, are owners of large tracts of land alleged to be of considerable value and clearly in excess of $3,000.00 exclusive of interest and costs, and these lands adjoin or are situate quite close to some of the territory flooded or controlled by the Authority. Plaintiffs allege that due to the construction, maintenance and operation of the Authority's project, they are suffering great loss and damage because of the rise in the water level caused by impounding of these river waters by the Authority so that their lands or portions of them are, at times, flooded, and, at other times, rendered moist and soggy and thereby ruined or damaged for agriculture or other purposes. They allege that they are suffering irreparable damages which cannot be adequately compensated by any money damages, and they further allege that the Authority is acting beyond the scope and power granted to it for the impounding of waters according to the license held by the Authority which was heretofore granted by the Federal Power Commission giving the Authority the right to maintain dams and generate and distribute electric power. And specifically, it is claimed that this license by the Federal Power Commission gives to the Authority the right to impound and maintain water up to seventy-five feet above sea level, but that in so doing, the Authority injures Plaintiffs' lands in a way and manner not contemplated by the maintenance of such a head of water, and the proper steps should be taken, if such a water level is to be maintained, to protect Plaintiffs' lands from suffering from the effect thereof. The Complaint goes further and alleges that from time to time the Authority exceeds this right to maintain water seventy-five feet above sea level and that it impounds water at a much higher level which increases the injuries to Plaintiffs' lands; and Plaintiffs take the position that the Authority has no right to have the water at this high level.

The suit is one brought on the equitable side of the Court, and the prayer is for relief by injunction to require the Defendant to reduce the water level and to take such other or necessary steps as may be adequate and proper to relieve the Plaintiffs of the burden now imposed upon them.

The Defendants appeared and filed a motion to dismiss on the ground that the Court is without jurisdiction to entertain this action since a suit of this kind cannot be maintained against the Authority which is an instrumentality of the State. It takes the position that such an instrumentality like the State or any of its political subdivisons is not subject to an action ex delicto. And it maintains that this suit is not one brought for the taking of the property of the Plaintiffs but instead is for the purpose of enjoining the Authority from committing acts that are alleged to be torts.

The Courts have had occasion, from time to time, to consider the nature and character of the South Carolina Public Service Authority, but the most recent and binding declaration on this point is the Opinion of the Supreme Court of South Carolina filed April 18, 1950 in the case of Rice Hope Plantation v. South Carolina Public Service Authority, S.C., 59 S.E.2d 132, 138. Since the Act creating the Authority is a part of the statutory laws of South Carolina, the construction of such an act by the Supreme Court of South Carolina must be accepted. In that case, the Court definitely states that the power of the Authority to sue and be sued given by the Act "cannot reasonably be construed to authorize an action *ex delicto*". The Court refers to the case of Chick Springs Water Co. v. State Highway Dept., 159 S.C. 481, 157 S.E. 842, which established the doctrine that the proper remedy where private property is taken for public use is an action at law to recover just compensation. In the Rice Hope case, it is pointed out that the Plaintiff urged (as do the Plaintiffs here) that the Authority, having obtained a license from the Federal Power Commission, had subjected itself to all the requirements of the Federal Power Act, 16 U.S.C.A. § 791a et seq., and that, therefore, it has become

pecuniarily liable for damages occasioned to the property of others by its acts. But the Court well says that the fact that the Authority is licensed under the Federal Power Act does not devolve upon it a "newly created liability" but that it merely means that if there is a legal liability, it is that of the licensee and not of the Federal Government. And, as a matter of fact, the Federal Power Act is quite specific. See 16 U.S.C.A. § 791a et seq. A careful reading of all the provisions of the Federal Power Act and of the cases that have arisen thereunder readily convince one of the soundness of the holding of the South Carolina Supreme Court on that phase of the case. The argument urging that the acceptance of a Federal license to manufacture power will impose new obligations while ingenious is not sound. It is quite clear that the Federal Power Act had no intendment of creating any new obligations on any person accepting a license except that it imposed upon the licensee the duty to obey and carry out the terms of the Federal Power Act and of the rules, regulations and decisions of the Commission. The various provisions for complaints to the Commission, for investigations and hearings, for the Commission to call upon the Attorney General to take action for the revocation of licenses, for forfeiture and for the right to go into the Federal Courts, are all rights and powers given for the protection of the Federal Government and the Commission created by the Act. And the sole responsibility put upon the licensee in regard to the rights of others is that if any party shall have any claim or right by reason of injuries arising from the use of the license, the licensee alone shall be responsible.

And so it follows quite clearly that the licensee here must be responsible for any injury or damage that it has created to the property of others irrespective of the Federal Power Act. And if it were a private corporation, we would not hesitate to say it could be sued for damages for tortious acts. But the Authority created by the State of South Carolina is declared by the State of South Carolina speaking through its Supreme Court to be such an agency or part of the state government as to be exempt from liability for tort and that being clear, and also that no additional liability is created by the Federal Power Act, we feel justified in definitely stating that the Authority cannot be held responsible for any damages arising from its torts.

Let it be understood distinctly that this suit is in no sense one for compensation for the alleged appropriation or taking of Plaintiffs' lands and as to whether the Plaintiffs have a right of action in this respect is not passed upon or considered. And the Court expressly refrains from discussing the same in this opinion.

And so we come now to the exact question propounded. Has this Court the right, power, and jurisdiction to grant equitable relief assuming that the allegations made by the Plaintiff are true and can be sustained?

Assuming for the purpose of argument in this case that the Authority is limited by its license to impounding water up to the level of seventy-five feet, are the Plaintiffs entitled to relief by a bill in equity because of the fact that the raising of water to such a level has infringed their rights and injured their lands? The cases are numerous holding that Plaintiffs in such plight have a right to compensation and a taking for public use. The Fifth Amendment of the Constitution of the United States provides: "nor shall private property be taken for public use, without just compensation." Article I, Section 17 of the Constitution of South Carolina is as follows: "Private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made therefor." The Supreme Court of the United States has spoken clearly in the case of Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637. In the Hurley case, the Court was asked to enjoin certain improvements proposed under the Mississippi River Flood Control Act, 33 U.S.C.A. § 702a et seq., because these works would result in flooding lands owned by Kincaid. The Court points out that there is ample protection afforded to the land owner, citing United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539, and a number of other well known

266

cases. The Court points out that the compensation which a land owner may obtain in such a proceeding will amount to the same as if the taker had instituted condemnation proceedings and the Court, 285 U.S. at pages 103–104–105, 52 S.Ct. at page 269, 76 L.Ed. 637, says:

"We have no occasion to determine any of the controverted issues of fact or any of the propositions of substantive law which have been argued. Kincaid concedes that the act is valid, and that it authorizes those intrusted with its execution to take his lands or an easement therein. We may assume that, as charged, the mere adoption by Congress of a plan of flood control which involves an intentional, additional, occasional flooding of complainant's land constitutes a taking of it—as soon as the government begins to carry out the project authorized. (Citing cases.) If that which has been done, or is contemplated, does constitute such a taking, the complainant can recover just compensation under the Tucker Act (24 Stat. 505) in an action at law as upon an implied contract, since the validity of the act and the authority of the defendants are conceded. (Citing cases.) The compensation which he may obtain in such a proceeding will be the same as that which he might have been awarded had the defendants instituted the condemnation proceedings which it is contended the statute requires. Nor is it material to inquire now whether the statute does so require. For even if the defendants are acting illegally, under the act, in threatening to proceed without first acquiring flowage rights over the complainant's lands, the illegality, on complainant's own contention, is confined to the failure to compensate him for the taking, and affords no basis for an injunction if such compensation may be procured in an action at law. The Fifth Amendment does not entitle him to be paid in advance of the taking. (Citing cases.)

"As the complainant has a plain, adequate, and complete remedy at law, the judgment is reversed, with direction to dismiss the bill without prejudice."

See also Manigault v. Springs, 199 U.S. 473, 26 S.Ct. 127, 50 L.Ed. 274, wherein the Court distinctly holds that Public Works will not be enjoined until compensation is paid where the injured party has a plain remedy for damages.

The Courts of South Carolina are in accord with the foregoing views of the Federal Courts. In Ingleside Manufacturing Co. v. Charleston Light and Water Co., 76 S.C. 95, at page 99, 56 S.E. 664 at page 665, the Court says: "The real issue, then, is whether the defendant having entered as a trespasser must wait until pending actions for trespass have been decided, or must vacate the lands by taking the water off, at whatever cost to itself and the inhabitants of the city of Charleston to whom it furnishes water, before it can have assessed the future damages and acquire the easement of overflowing the lands by condemnation. Manifestly nothing but the clearest statutory requirement would warrant a conclusion affecting so injuriously public as well as private interests. There is nothing in the statute requiring such a hardship—a hardship entirely unnecessary for the protection of the rights of the property owners. The people at large are so much concerned in the development of such public service as the defendant corporation has undertaken, that the statute which allows it to condemn should be given a liberal construction, and held to embrace every condition that can possibly be brought within its terms, so long as private rights are adequately protected. The reasonable and just view is, that the illegal entry entitles the owner of the land trespassed upon to recover damages for the trespass in an action in any court of competent jurisdiction, but subject to its liability in such action for the trespass, the corporation has the right to institute condemnation proceedings to obtain the necessary easement and ascertain the future damage to the property just as if it had not trespassed. The verdict of compensation, in an action for damages for the unlawful entry and its injurious results up to the time of the commencement of condemnation proceedings,

is all the owner can ask, and when his right to this verdict is reserved, he has no ground to complain that condemnation should proceed as if there had been no trespass."

And again the same Court says in Belton v. Wateree Power Co., 123 S.C. 291, at page 306–307, 115 S.E. 587, 592: "The rule as established by the decisions of this court is that where the right of condemnation exists and the corporation takes possession of the property of another, without the consent of the owner, express or implied, or by condemnation, it becomes a trespasser, and that, while it may be made liable in damages for such unauthorized entry, it may not be ejected as an ordinary trespasser; that, having the right to take the property under condemnation, it may retain possession upon payment of due compensation to the owner for the taking. Cayce Band Co. v. [Southern] R. Co., 111 S.C. 115, 96 S.E. 725; Ingleside [Manufacturing] Co. v. [Charleston] Light & Power Co., 76 S.C. 95, 56 S.E. 664."

To the same effect is the decision in Chick Springs Water Co. v. State Highway Department, 159 S.C. 481, at page 497, 157 S.E. 842, 848, where the Court says: "In actions against the State for compensation for property taken, the Constitution itself gives consent for the state to be sued, and, where the Constitutional Convention has given such consent, no act of the General Assembly is needed for that purpose, nor is it in the power of that body to deny it, for "a constitutional provision shall never be construed as dependent for its efficacy and operation upon the legislative will." Swift & Co. v. Newport News, supra [105 Va. 108, 52 S.E. 821, 3 L.R.A., N.S., 404]."

■ Plaintiffs argue that the above quoted language of Article I, Sec. 17 of the Constitution of the State of South Carolina specifically forbids taking private property without just compensation *"being first made therefor."* Counsel have pointed out that the language of this section is different from that of the Fifth Amendment to the Constitution of the United States and is, in fact, different from the 1868 Constitution of South Carolina; and

that the language and words of the section clearly indicate that the people of South Carolina intended to apply a different rule for compensation. I cannot follow this argument. The only fair construction of the addition of these last words is that the public authorities are not warranted in walking in and ousting people there without instituting appropriate condemnation proceedings. But these words cannot be construed to mean that where a taking has occurred as in the instant case, where it must be admitted to be inadvertent, that the whole set-up of the public works must be reversed, a great engineering project torn down or abandoned until appropriate condemnation proceedings can be brought. All of the cited cases from South Carolina were decided after the adoption of the Constitution of 1895. In none of them was, such a point made or raised and the language and meaning of all of the cases is that one injured by such a taking has his clear remedy at law and the Court of Equity will not interfere except under the most extraordinary circumstances and even then only to prevent a threatened injury and not to remove injuries which have already occurred where there is a plain and adequate remedy at law.

■ A further position taken by the Plaintiffs in this case is that the Authority has, from time to time, raised the water above seventy-five feet. For the purpose of this case, assuming this to be true and that this action does not consist of mere sporadic acts but has been done and maintained over reasonably long periods and has caused damages to Plaintiffs' lands; still, what is the remedy? Undoubtedly, the remedy is an action at law for compensation for taking property just as there is if the level be only seventy-five feet.

Finally, the Plaintiffs say that it is the duty of this Court to enjoin the Authority and its officers from going over the seventy-five foot level because of the provisions of the license itself. My attention has been called to a copy of that license which was heretofore filed in this Court in an-

other proceeding (Civil Action No. 2293).[1] A license was originally issued to a private corporation which was considering the construction of a power and navigation project connecting the Santee and Cooper rivers. From time to time, there were alterations and modifications in this license and finally all of the rights of the private concern having been acquired by the South Carolina Public Service Authority, which in the meantime had been created, the license went to it. The manner of construction of the project, the location of the same and its general purposes were set out and described in the license and its sundry amendments and extensions. The particular portion referred to and discussed in this case is known as "Instrument No. 12; Federal Power Commission Amendment No. 8 of License Project No. 199-South Carolina; South Carolina Public Service Authority." This amendment purports to be for the purpose of "changing the description of the project works". There then follow a large number of paragraphs generally describing the manner of construction, one of which is as follows: "(b). A reservoir created by the said diversion dam with water level at 75 feet above mean sea level", and again in paragraph "(d). a reservoir created in Ferguson swamp by the above last-mentioned dam and dikes with water level at 75 feet above mean sea level". It is argued, and I believe correctly, that this is a general description of the manner of construction of and results to be obtained by the proposed dams and dikes and other works. There are further provisions in the same amendment providing that the Authority will have to control the flow of water in the Santee River and also in the diversion canal leading to the Cooper River so as to insure the proper operation of navigation facilities and with a limitation on the velocity of the current. From these provisions, it is clear that the Government had in mind that there would be variations and fluctuations in water level since in one paragraph, reference is made to "the difference in elevation between the two reservoirs". There is a further provision in the same amendment as follows: "Article 35. The Licensee shall, at any time, make such changes, alterations, or additions in the design and in existing structures as the Commission may deem necessary and so order in the interests of safety of life and property." It is quite clear from a study of this license together with a consideration of the whole problem that all of these requirements and limitations were subject to change and fluctuation as the work progressed and engineering difficulties were encountered and had to be overcome. Nowhere do I find any provision against a water level of more than seventy-five feet, but it is clearly evident that in the description of the work to be done to carry out the purposes of the project, there were estimates of how much water would be impounded; to what height it would rise; how the flow of the respective levels would be affected; and the control of such flow; having in mind at all times the uses of the water for navigation and for power purposes. In addition, the parties in interest had constantly in mind the effect that these works would have upon forestry, agriculture and sanitary conditions in the surrounding areas.

If, as is contended by the Plaintiffs, the raising of this water to a level of more than seventy-five feet is in violation of the license and is detrimental to the health and well being of the surrounding territory then it is the duty of the Federal Power Commission to take action. The Federal Power Act gives ample opportunity to parties interested to call these alleged improper acts to the attention of the Commission; and elaborate machinery is provided for the Commission to investigate, have hearings, issue directions, and if the licensee does not comply, take court action. But the enforcement of the license is a matter exclusively for the Federal Power Commission. And no right is given for a private individual to bring an equitable action in the District Court. And so I am definitely of the opinion that even if the powers given by the license under the Federal Power Act have been.

---

1. No opinion for publication.

exceeded, this suit is not the proper way to remedy the situation.

For all of the foregoing reasons, I am of the opinion that the Plaintiffs are without standing in this Court in the form of action herein brought. As heretofore stated, I express no opinion as to what, if any, rights or remedies they may have in this or any other Court in any other form of action which they may determine to adopt; this opinion and order being limited strictly to the instant case. In accordance with the foregoing views, it is

Ordered, that this action be and the same is hereby dismissed.