### UNITED STATES v. BURNETTE.
#### Civ. No. 1087.

United States District Court
W. D. North Carolina, Asheville Division.
March 13, 1952.

646

Thomas A. Uzzell, Jr., U. S. Dist. Atty., Asheville, N. C., for plaintiff.

E. F. Watson, Spruce Pine, N. C., Fouts & Watson, Burnsville, N. C., for defendant.

WARLICK, District Judge.

The United States in prosecuting this action, seeks as relief, a judgment in the first

instance declaring it to be the owner of certain lands described in the complaint to the exclusion of all other persons, and that the defendant and anyone claiming under him be perpetually enjoined and restrained from entering and trespassing on the lands involved. The action concerns title to 19.-79 acres of land, lying and being in Yancey County in the Western District of North Carolina, which from the allegations of the complaint the defendant has entered upon and as such trespassed in removing therefrom standing timber and shrubbery. A restraining order was sought and on the showing made, was granted, enjoining said trespassing and cutting of said timber and shrubbery.

Title to the lands involved was acquired by the government by condemnation proceedings instituted on the 16th day of July, 1914, in the United States District Court for the Western District of North Carolina, at Asheville, in that certain action entitled "United States v. S. Montgomery Smith," and approximately 700. other defendants who owned the property embraced in the area then being condemned. This property in controversy is a part of the Mt. Mitchell area and is within the boundaries of a tract under this condemnation of 9,655.48 acres. Title to the whole of the property which embraces the area in controversy was duly adjudged to be in the United States, the claimant herein, by virtue of a final order entered in the proceeding on November 21, 1915, wherein it was adjudged: "That upon the payment by the United States of America into the custody of this Court as provided in the next preceding paragraph of the said amount as awarded as aforesaid, the fee of all the lands described in said Petition for Condemnation as amended, and more particularly hereinafter described, and all and every right, title and interest in and to the same, shall thereupon become and be vested in the United States of America with full right and authority to have, hold, use, possess and enjoy said lands for its public use forever, and shall thereby be released and discharged of any claim or damages by reason of such taking."

It being further set out in said final judgment: "That the said defendants, and all persons, be forever barred from any right, title or interest therein, and that the United States is adjudged to be the sole owner thereof in fee simple, free from the claims of all persons whomsoever * * *."

In an effort to show title in the plaintiff, the whole of the condemnation proceeding was offered in evidence, together with the maps, plats, field notes, surveys, etc., and was available for inspection and study. From such study it would certainly appear that a considerable period of time was used previously to the condemnation by the surveyors, engineers, draftsmen, and other workers in the actual surveying in the field, and that abstract and title research had been extensively gone into. Full notice of condemnation was personally served upon many of the owners as defendants, and notice by publication appears to have been given through the Asheville Citizen for all of those alleged owners who could not be found and personally served. The statutes seem to have been meticulously observed and on appraisers being named, values were ascertained, made a part of the record, and subsequently the amounts awarded by the commissioners and appraisers were paid into the office of the Clerk for distribution to those entitled. No exception seems to have been taken thereto, and no objections were laid to the actions of the Commissioners.

Immediately following the condemnation and the payment of the monies into court for the claimants, the United States, through its proper agencies, took possession of the whole of the area of the lands condemned, and thereafter caused said lands to be patrolled and managed as a part of the Forest Reserve, and through these respective agencies has been in full possession of the whole of said boundary, including the land in controversy, through the subsequent years and still is in the occupancy thereof.

On June 3, 1899, the State of North Carolina issued to one Billy Goodson, grant No. 13958 for 212 acres of land, which grant is a part and parcel of the lands embraced in the condemnation, the metes and bounds of which are set out in the pleadings filed.

On January 14, 1847, the State of North Carolina issued to one James Hemphill a grant, which was numbered 544, to 100 acres of land lying in Yancey County, North Carolina, and described by metes and bounds in the further answer and defense of the defendant. On August 15, 1938, this same tract of land theretofore belonging to James Hemphill, his heirs and assigns, was undertaken to be conveyed to the defendant in this action by one Charles Hutchins, Commissioner, appointed for that purpose by the Superior Court of Yancey County, North Carolina, as appears from the public registry of said county, in Book of Deeds No. 81 at page 538. Under this conveyance the defendant went into possession of said tract of land and is now the owner of such portions of said lands as had not theretofore been condemned or otherwise conveyed by the defendant or his predecessors in title. The defendant on securing this title thereof seems to have had it recorded in the public registry of McDowell County in Book of Deeds 85 at page 626. Subsequent to the conveyance to him in 1938, the defendant sold and conveyed to the State of North Carolina certain portions of the land and delivered warranty deed therefor.

While this action was pending and for a more comprehensive knowledge of the factors involved, surveyors were appointed by the court to make a survey of the lands in controversy and to make maps and plats thereof so that they could be used in the development of the evidence and the situation thereunder, one of these maps being attached hereto and being made a part of these findings of fact.

The contention of the government as surveyed and laid out on the "court map" is to the effect that the beginning corner of the James Hemphill survey begins "at a chestnut stump USFS Cor 6 on the crest of the Blue Ridge Mountains, marked by a blue "X" and follows the meanders of the Blue Ridge to USFS Cor 37 where a similar blue "X" has been marked and that from that point to USFA Cor 38 similarly marked, and thence to USFS Cor 39; thence back to the point of beginning".

The defendant's contention is marked by the red letter "X" and begins "at No. 1, passing No. 2, thence to No. 3; thence to No. 4; thence to No. 5 and back to the point of beginning."

The area in dispute is shown in that boundary containing 19.79 acres which is shown at the top of the court map.

■ Going carefully into the evidence heard in conjunction with the exhibits offered, and taking into consideration the natural objects, I am of the opinion that the whole of this controversy can be determined on the original beginning corner of the James Hemphill grant being located. Other factors will add strength to this conclusion. I am of the opinion that the original beginning corner of the James Hemphill grant is what is marked down as Corner No. 40 on the survey made prior to and as a part of, and used in the condemnation of said property embraced in the Mt. Mitchell area and as is shown on plaintiff's exhibit No. 13. A great deal of credence is lent to this conclusion by the original surveyor's notes as is contained on page 12 of the plaintiff's exhibit No. 14, wherein it is said "corner 40, the original beginning corner of the James Hemphill grant, No. 544, a chestnut, 10# in diameter, standing on top of the Blue Ridge in the county line between McDowell and Yancey County, with the original marks blazed,", etc. This conclusion is an inescapable one as a study is made of the survey and maps offered in evidence.

The history of land surveying in the mountains of North Carolina from the experience I have had over the years, in the trial of matters involving title, has always been one of those intriguing sort of things. Those adventurous individuals who blazed the frontier trails had a fine conception of natural objects and landmarks and almost without exception followed them in the establishment of frontier posts and the boundary lines between individuals. A study of the various counties in North Carolina indicates that these natural objects were the distinguishing characteristics of county lines and boundaries.

At the time James Hemphill, and presumably his brother, Thomas Hemphill, secured their respective grants from the State, they had the option of free agency as much so as could have been found anywhere and it would be presumed that they followed the tops of the ridge, the meanders of the streams and the other basic principles of rough and tumble surveying. The original grant to James Hemphill shows that the land lay in Yancey County. The map accompanying the application for the grant and as surveyed on May 15, 1846, on which the grant of January 14, 1847 was based, shows that the crest of the Blue Ridge Mountains was followed, in that the calls thereon show the contour of the Blue Ridge and its meanderings as is indicated by all of the subsequent maps filed in the proceeding. No one seems to have come up with the idea that any of the land embraced in the James Hemphill tract lay in McDowell County until the defendant recorded his conveyance in 1938, 91 years after the original grant. To locate the beginning corner of the defendant's land at the point as contended by him, would be to place 21.-8 acres of the land in McDowell County and then cause a line to be run along the face of the Blue Ridge over well nigh a sheer precipice, and where even the foolhardy of this day and time would not likely undertake to locate in virgin lands the dividing line between owners. Likewise to follow the lines as contended for by the defendant would be to exclude certain lands lying adjacent to the south fork of the South Toe River which the defendant, by deed conveyed to the North Carolina State Highway and Public Works Commission. Further, to follow the defendant's contention would be to leave in the State of North Carolina certain lands unappropriated and subject to entry at this late date, upon which are located springs and streams which bear the name of Hemphill. This would be the only way in which by any line of reasoning the defendant could be classed as the owner of the lands in controversy. Every natural object indicates to the contrary, and I am of the opinion and so find that the lands of the defendant are those lands embraced within the area set down on the map and marked by the blue figure "X" and that the plaintiff is the owner in fee simple of the lands alleged to have been entered and trespassed on by the defendant.

The defendant in addition to setting up ownership of the property by mesne conveyance down to and from the original grantee, James Hemphill, pleads as a defense adverse possession under the various North Carolina statutes of limitation. Plaintiff files a reply denying such adverse possession as alleged by the defendant, and sets up such adverse possession for the plaintiff for the required number of years.

Having thus disposed of the question of title, but going further in line with the pleadings filed, and assuming that it should be held that the survey made in 1912-13 under which the condemnation subsequently was had was incorrect or was in error, then it would appear from the evidence that the government has been in possession under known and visible lines and boundaries for a period of 37 or 38 years, and that title under the applicable statutes would have become indefeasible in the government. General Statutes of North Carolina, §§ 1-35, 1-37, and 1-38. The statutes of limitation are not available against the government and therefore do not apply as such, and neither can title by prescription be acquired to property belonging to the United States. U. S. v. Stewart, 9 Cir., 121 F.2d 705. U. S. v. California, 332 U.S. 19-46, 67 S.Ct. 1658, 91 L.Ed. 1889.

The defendant undertakes likewise to question the title acquired by the plaintiff in the condemnation proceeding herein. This it would appear he cannot do. "Upon the filing of said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the

persons entitled thereto;" Title 40, U.S.C. A. § 258a.

This statute undoubtedly reflects that the intent of the Congress was that the issue of title as between the United States and the property owner should not be subject to litigation in a proceeding to condemn private property for public purpose, and that the thing left to determine was the amount of "just compensation" to the property owner whose property was being taken for a public purpose. The only limitation placed on the government being that contained in the Fifth Amendment to the Constitution of the United States "nor shall private property be taken for public use, without just compensation."

The condemnation proceeding is one strictly in rem and the owner of the property is relegated to the fund in order to satisfy "just compensation" to him. U. S. v. 25,936 acres, 3 Cir., 153 F.2d 277. Consequently if the government survey of 1912–13 was not correct and did in fact contain and thereupon convey part of the James Hemphill tract, and such was taken by the government, then it would appear that upon the notice by publication as contained in the Asheville newspaper that Hemphill should have answered and set forth his claim, or if he were not made a party by the notice of publication, there is ample authority for such position, that is, his right to intervene. U. S. v. 8677 acres of land, D.C., 42 F.Supp. 91. U. S. v. Certain parcels of land, D.C., 40 F.Supp. 436, 444.

In the above case Judge Chesnut in writing the opinion, goes very elaborately into the law and sets forth a complete answer to the positions taken. "It is equally true that unnamed and unknown owners cannot be constitutionally deprived of their property without just compensation and without adequate notice. It seems logical to follow that interests of unnamed and unknown parties are not concluded by the proceedings, and they must be entitled to just compensation in some way, even though the government has taken title and possession to the land and the fund has been fully distributed by the court."

Speculating further in said opinion, Judge Chesnut holds that even upon the dissipation of the entire fund as paid in by the government that one whose property has been taken would have the right to obtain "just compensation" by suit against the United States, under the Tucker Act. 28 U.S.C.A. § 41(20), Hurley v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 and many other cases cited.

Manifestly under the above if the lands of James Hemphill were taken under the survey of 1912–13 and condemnation of 1914, that James Hemphill, if he were living, or his heirs or assigns, and not the present defendant, would have been entitled to institute an action for "just compensation." James Hemphill certainly instituted no such action and did not attempt to assign his claim, if any he had, and indeed, such claim was not assignable. 31 U.S.C.A. § 203.

Again the court said: "The owner at that time (time of declaration of taking) rather than the owner at an earlier or later date, is the one who has the claim and is to receive the payment. This would seem to be equally true whether the taking is without authority of a court order or in compliance with a court order requested by the condemnor." 23 Tracts of Land v. U. S., 6 Cir., 177 F.2d 967, 970.

Neither is the government concerned with the distribution of the fund in that it has discharged its full responsibility when the money awarded by the commissioners as "just compensation" and being unappealed from, has been paid into the registry of the Court. U. S. v. 19,573.59 acres, D.C., 70 F.Supp. 610; State of Neb. v. U. S., 8 Cir., 164 F.2d 866.

Notice published in the newspaper currently circulating in the area in controversy appears to have been sufficient. U. S. v. Carey, 9 Cir., 143 F.2d 445.

For certain it is that "due Process of law" requires no more than that the owners be given an opportunity to be heard at some stage of the condemnation proceedings upon reasonable notice of its pendency. City of Oakland v. U. S., 9 Cir., 124 F.2d 959.

I conclude therefore, that the United States is the owner of the lands in controversy containing 19.79 acres and that the defendant has no right, title or interest thereto, and that as such owner the plaintiff is entitled to an order perpetually enjoining and restraining the defendant and those claiming under him, from entering upon said land and from otherwise evidencing any acts of ownership.