16658

CAIN *ET AL.* v. SOUTH CAROLINA PUBLIC SERVICE
AUTHORITY

(72 S. E. (2d) 177)

*Messrs. R. M. Jefferies,* of Walterboro, *Norvall N. New-ell,* of Moncks Corner, *Robert McC. Figg, Jr.,* of Charleston, and *W. D. Simpson,* of Moncks Corner, *for Appellant,*

*Messrs. Samuel Want,* of Darlington and *Dennis & Dennis,* of Moncks Corner, *for Respondents,*

*Messrs. R. M., Jefferies,* of Walterboro, *Norvall N. Newell,* of Moncks Corner, *Robert McC. Figg, Jr.,* of Charleston, and *W. D. Simpson,* of Moncks Corner, *for Appellant, in reply,*

August 12, 1952.

Oxner, Justice.

This action was brought to compel the South Carolina Public Service Authority to convey to the plaintiffs approximately 33.3 acres of a 1170 acre tract of land in Berkeley County, which was acquired from Elizabeth R. Cain by condemnation under an Act of the General Assembly, approved May 31, 1939, 41 St. at L. 265, now incorporated as Sections 9111 to 9125, inclusive, of the 1942 Code. Mrs. Cain died on June 1, 1941, leaving a will wherein she bequeathed and devised all of her property, except household goods and personal effects to her children, who are the plaintiffs in this action. The asserted obligation of the Authority to convey said property to the plaintiffs is based on a repurchase provision contained in the above mentioned Act. The construction of this provision is the focal point of this controversy. The facts and issues presented on this appeal can better be understood by first reviewing the pertinent portions of said Act.

Section 2 (now Section 9112 of the 1942 Code) provides that all "state authorities" established for the purpose of developing waterways, producing and distributing electric power, reclaiming and draining swampy and flooded lands, improving health conditions, or reforesting water sheds, shall have the right of eminent domain for any of such purposes and are authorized to exercise same in the manner stated in the Act. Section 12 (now Section 9122 of the 1942 Code) states that the powers of condemnation therein given shall be cumulative to, and shall in no way repeal or restrict, any right of condemnation previously given by law to such authorities. Section 3 (now Section 9113 of the 1942 Code) is as follows:

"For the general welfare of the State and in the public interest, and to provide for the payment of just compensation on account thereof through the exercise of the right of eminent domain by said authority established by the State

for purposes defined in section 9112, a method of condemnation procedure, as hereinafter more fully provided, is hereby established whereby such state authority may exercise the right of eminent domain. The power of condemnation and the method of condemnation procedure shall include and be applicable to the condemnation of property necessary or useful or convenient for the public purposes herein mentioned, including all lands or interests therein which may be necessary or useful or convenient in the construction of dams, canals, locks, power houses or reservoirs, and including borrow pits, flowage rights, waters, water rights, riparian rights, easements, rights-of-way, and all other rights necessary or useful or convenient in carrying out the purposes of said state authority. Unless said state authority shall state in the notice to owners hereinafter provided for that it seeks to acquire an estate other than one in fee simple, all properties to be acquired under the terms and provisions of this article which said authority shall determine are to be actually covered by impounded water, or occupied by dams, structures, or borrow pits shall be in fee simple and all lands between the high water mark, as established by said state authority and a line not exceeding 100 lineal feet beyond the maximum high water mark of water impounded or to be impounded, and within a reasonable distance from any dam, dike or structure, shall be in fee simple, but said state authority shall arrange to permit the previous owner of said 100 feet strip, and his heirs and assigns, to pass over and across said strip which may be acquired hereunder, and any and all lands of said state authority which are not actually covered with water at convenient places for purposes of ingress and egress to the reservoirs and said state authority, which right shall be exercised so that the same will not interefere with any dams, dikes, structures and buildings of said state authority or the application and use of said state authority of proper health and sanitation measures and said strip and all of the lands acquired by the authority may be controlled by the authority for health and sanitation meas-

ures to the extent of exclusion of the public from said strip and lands at such times as may be necessary; provided, however, that, if the lands, or any portion thereof, acquired by said state authority hereunder are not occupied for the purposes of erecting dams, dikes and structures, including lands acquired near said dams, dikes and structures for purposes of protecting said dams, dikes and structures and for purposes of obtaining materials for maintenance, and the one hundred feet strip from the said maximum high water mark, and unless said lands above the dams, dikes and structures are actually covered with water, within a period of five years from the date of acquiring lands hereunder, the owner of any tracts of land acquired by said state authority under this article shall have the absolute right to repurchase said lands from said state authority upon the payment by the owner to said state authority of the amount paid by said state authority to said owner less any damages which said lands may sustain by reason of said state authority having occupied the same, together with depreciation in value of said lands and any special damages which the owner may have sustained by reason of said state authority having acquired said land hereunder. If the owner and the said state authority should fail to agree upon the amount of damages as above specified, which shall be deducted from the amount to be repaid by said owner, then said damages shall be ascertained and established under the procedure herein provided for the acquisition of lands by appointment of referees and with full right of appeal to both parties as provided for in the original acquisition hereunder. Unless the owner shall exercise his right to repurchase said lands within a period of one year from the expiration of the five years above provided, then said right shall cease upon the authority giving to said owner ninety days notice that said right will expire at the end of said ninety days. Such state authority shall also have the right to acquire by condemnation all water and flowage rights in any and all land in the vicinity of said projects, which it may determine to be necessary, useful or convenient

or which might be damaged by reason of the construction or operation of such projects, and on such lands the state authority may establish such health control measures as may be necessary."

In Section 4 (now Section 9114 of the Code), it is stated that for the purpose of the Act, "the words 'owner' or 'owners' shall include any one claiming any interest in the property or rights sought to be condemned whether by way of present interest, or by way of vested or contingent remainder, possibility of reverter or otherwise, * * *."

The remaining sections of the Act need not be reviewed as they relate merely to the procedure to be followed in exercising the right of condemnation.

The South Carolina Public Service Authority was created by the General Assembly in 1934. 38 St. at L. 1507. This Act, as amended, now constitutes Sections 8555-11 to 8555-24, inclusive, of the 1942 Code. Under its terms, the Authority was empowered "to develop the Cooper River, the Santee River, and the Congaree River in this State, as instrumentalities of intrastate, interstate and foreign commerce and navigation; to produce, distribute and sell electric power; to reclaim and drain swampy and flooded lands; and to reforest the water sheds of rivers in this State." The Authority was also given all powers necessary or convenient for the exercise of the powers stated. In *Creech v. S. C. Public Service Authority*, 200 S. C. 127, 20 S. E. (2d) 645, 648, the Court said: "In our opinion, the South Carolina Public Service Authority is a public corporation in the nature of a quasi municipal corporation, exercising certain governmental functions as an agency of the State."

In the exercise of the foregoing powers, the Authority erected a dam across the Santee River, thereby impounding a large quantity of water in a reservoir or artificial lake, and constructed a diversion canal to carry water from this lake to a basin situate near the head waters of the Cooper River, which basin was made by building additional dams

and dikes. It has also erected a power house for the purpose of generation of hydro-electric power. The project was begun in 1939 and was practically completed and placed in operation in 1942. In the construction of this large hydro-electric and navigation project, the Authority acquired, either by purchase or condemnation, more than 200,000 acres of land in several counties, including the County of Berkeley.

Included in the property acquired by condemnation was the 1170 acre tract of land belonging to Mrs. Elizabeth R. Cain. Proceedings for condemnation of this tract were instituted in July, 1939. A trial was had in March, 1940, and the jury fixed the sum of $21,352.50 as the value of the entire tract, or an average of $18.25 per acre. This amount was duly paid and deed executed to the Authority by the Clerk of Court for Berkeley County on April 16, 1940.

When Lake Moultrie, the lower of the two lakes in the Santee-Cooper project, was filled with water to its maximum operating level of 75 feet above mean sea level, the whole of the 1170 acre tract with the exception of 33.3 acres involved in this controversy was actually covered by the waters of said lake. On November 26, 1945, or about three years after the project was completed, plaintiffs demanded that the Authority convey to them the 33.3 acre tract, tendering therefor the sum of $607.63, which was calculated on the basis of $18.25 per acre, the average price per acre paid by the Authority for the entire 1170 acre tract. The Authority refused to convey and this action was instituted on April 1, 1946.

It is alleged in the complaint that of the 1170 acres acquired by the Authority from plaintiff's mother, a portion containing approximately 33.3 acres "has not been occupied for the purposes set forth in said Act, and has not been actually covered with water within a period of five years from the date of acquisition"; and that plaintiffs, pursuant to the right granted by the Act to the person whose property was condemned, had exercised the right to repurchase the

portion of said tract of land not used or occupied for the purposes specified in said Act and had duly offered to pay the proper amount due, but the Authority had refused to convey said property to the plaintiffs. Specific performance is sought of the asserted legal duty and obligation of the Authority to convey the 33.3 acres of land to the plaintiffs.

The defendant demurred to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action in various specified particulars. This demurrer was heard and overruled by Judge Grimball in an order dated June 30, 1948. Due notice of intention to appeal to the Supreme Court was served by the Authority. Thereupon the parties entered into a stipulation that the appeal from the demurrer need not be perfected until after final judgment. An answer was then served by the defendant. The Authority denied the right of plaintiffs to repurchase the property in question. It alleged in its answer that almost all of the 1170 acre tract had been covered by water and that the remaining portion "has been occupied for the purposes of erecting dams, dikes and structures, including lands acquired near said dams, dikes and structures for the purpose of protecting the same and for the purpose of obtaining materials and for the 100-foot strip", which use precluded any right of repurchase; that the plaintiffs had not tendered the amount paid to Mrs. Cain for the property; that the property condemned had increased in value by reason of the improvements made by the Authority and by the construction and operation of the project; and "that the property sought to be repurchased is located almost at the center of the defendant's project and constitutes an essential and useful part thereof, and that any reconveyance of said property would do irreparable injury to the defendant and would hamper and prevent the performance of the public duties and obligations of the defendant."

On January 22, 1949, by consent of the parties, the case was referred to Honorable A. F. Woods of Marion, as Special Referee, to take and report the testimony, together

with his conclusions of law and fact. After holding a number of references, at which a vast amount of testimony was offered, the Referee, on February 14, 1951, filed a report wherein the major issues were decided in favor of the plaintiffs. On exceptions by the Authority, the case was heard by Judge Baker, who, on September 27, 1951, filed a decree adopting the report of the Special Referee except in one unimportant particular, and directing the Authority to execute and deliver to the plaintiffs a deed conveying the 33 acres of land in question upon payment by them of the sum of $607.73, the amount originally tendered to the Authority prior to the commencement of this action.

The case comes before us on appeal by the Authority both from the order of Judge Grimball overruling the demurrer and the order of Judge Baker granting the relief sought in the complaint.

The 33 acre tract in controversy juts into Lake Moultrie, forming a peninsula and making a very attractive setting. No substantial part of this tract has ever been covered by water, although the project has been in operation for approximately ten years. There has been some erosion near the water edge and at times a small portion of the tract has been temporarily overflowed when the waves were high. When condemned, there was a dilapidated plantation house and one or two old cabins on the property. The Authority has now made improvements costing approximately $30,000.00. The plantation house was remodeled. Quite a number of new buildings have been erected, including an assembly hall with a spacious dining room, a warehouse, and numerous cabins. There are now sufficient sleeping quarters and dining room facilities to take care of a large number of people. These facilities are used at various times by officials, the board of directors and employees of the Authority. In addition to business use, civic and other organizations are at times permitted to have meetings on this peninsula. It is an ideal place for entertainment and is frequently used for this purpose. There is a pond on this property, described in the testimony

as a gum pond, which is now used for making experiments in malaria control. The changes made in this pond by the Authority are described by the Referee as follows:

"During January or February, 1946, the Authority placed a small dirt dam across this gum pond together with so-called floodgates and a so-called tail race or tail canal. The witness, J. H. Moore, defendant's chief engineer, testified that the dam was three or four feet high. Plaintiff's witness, J. P. Gaillard, describes it as 'a bank, a little old bank; it was not any dam'. The testimony also shows that the so-called floodgates are merely boards movable up and down, and that the so-called tail race or tail canal is merely a ditch measuring about two feet across and about three feet deep. After the construction here referred to the water now in this depression is no higher than the grass standing therein. This pond now embraces an area of approximately 4.4 acres. According to defendant's witness, E. T. Heyward, the cost of this part of the Authority's vast project, costing many millions of dollars, was $619.35. It is now used by the Authority for experiments in connection with mosquito control."

There are 36 exceptions to the orders of Judges Grimball and Baker, which raise the following questions:

(1) Does the right of repurchase granted by the Act of 1939 extend to the heirs or devisees of the person who was the owner at the time the property was condemned?

(2) Does the right of repurchase exist where the project for which the land was condemned is completed and put in operation within five years after the property was acquired?

(3) Does the Act permit repurchase of a portion of a tract condemned as a unit?

(4) Is the 33-acre tract less than 100 feet from the "maximum high water mark" of Lake Moultrie?

(5) Does the 33-acre tract constitute "lands acquired near said dams, dikes and structures for purposes of protecting said dams, dikes and structures"?

(6) Are the lands in controversy occupied by the Authority "for the purpose of erecting * * * structures"?

(7) Does the right of repurchase exist where the land in controversy is being used and occupied in furtherance of any of the purposes for which the Authority was established?

All of these questions were decided by the Court below adversely to appellant.

Before undertaking to discuss the issues involved on this appeal, we might state that the task of finding a satisfactory and reasonable construction of the Act under which this property was condemned has not been an easy one. It is awkwardly drawn and certainly does not furnish a model for clarity. It also contains an unusual provision granting under certain circumstances a right of repurchase by the owner, which is somewhat novel in statutes giving the right of eminent domain. Moreover, the purpose of the enactment of this legislation is not free from doubt. It seems to be conceded that the Authority had the right of eminent domain prior to the passage of this Act. Indeed, the Act creating the Authority gave it this right. Section 8555-15 of the 1942 Code. Counsel for appellant also call our attention to several other statutes under which they say the Authority had the right of condemnation. Counsel for respondents say that "when the Authority acts under the general condemnation statutes it might be subjected to the requirement that it establish the *necessity* of the condemnation, and might obtain only an easement." Apparently this view is not shared by counsel for appellant. But we shall not undertake to determine what rights of condemnation appellant had under other statutes. We are only concerned here with the construction of the Act of 1939 because it was under this Act that the property in question was condemned and it is under the terms of this Act that respondents claim the right to purchase the 33-acre tract of land.

To properly construe the Act, it is first necessary to determine whether it should be strictly construed against, or liberally in favor of, the landowner. It is argued by appellant that the right of repurchase is "a grant by the public" without consideration and should be strictly construed in favor of the public. There can be no doubt of the soundness of the rule that legislative grants are subject to a strict construction and any ambiguity therein must be resolved in favor of the public or government. *State v. Pacific Guano Co.,* 22 S. C. 50; *Coosaw Mining Co. v. State of South Carolina,* 144 U. S. 550, 12 S. Ct. 689, 36 L. Ed. 537. This rule, which has sometimes been based upon the demands of public policy and the protection of the public interest, has generally been confined to cases of mere donation. 50 Am. Jur., Statutes, Section 424. We do not think that the provision as to repurchase can soundly be classified as a mere donation. On the contrary, it constitutes a portion of an act granting the power of eminent domain. The extent to which such power "may be exercised is limited to the express terms or clear implication of the statute in which the grant is contained." 18 Am. Jur., Eminent Domain, Section 26. In other words, statutes giving the right of eminent domain must be strictly construed. *Leitzsey v. Columbia Water Power Company,* 47 S. C. 464, 25 S. E. 744, 34 L. R. A. 215; *Paris Mountain Water Company v. City of Greenville,* 105 S. C. 180, 89 S. E. 669.

The right of repurchase is contained in a proviso following the grant of the right of eminent domain and the proviso cannot properly be isolated from that which precedes it. "The natural and appropriate office of a proviso is to modify the operation of that part of the statute immediately preceding the proviso, or to restrain or qualify the generality of the language that it follows." 50 Am. Jur., Statutes, Section 438. To the same effect, see *Shealy v. Seaboard Air Line Railroad Co.,* 131 S. C. 144, 126 S. E. 622; *State v. Standard Oil of New Jersey,* 195 S. C. 267, 10 S. E. (2d) 778. We think that the proviso in the instant

case giving to the landowner the right to repurchase under certain specified circumstances was intended to limit or qualify the right of eminent domain granted by the Act and constitutes a condition annexed thereto.

For the foregoing reasons, the basic assumption underlying appellant's argument that the repurchase provision should be construed strictly against the landowner is unsound. On the contrary, it should receive a liberal construction. Of course, no rule of construction may be used to defeat the legislative intent. *Jeff Hunt Machinery Co. v. S. C. State Highway Department,* 217 S. C. 423, 60 S. E. (2d) 859. The paramount consideration is to ascertain and give effect to the intention of the law making body. *Pickens v. Maxwell Bros. & Quinn,* 176 S. C. 404, 180 S. E. 348; *Greenville Enterprise, Inc. v. Jennings, Chief of Police of the City of Greenville,* 210 S. C. 163, 41 S. E. (2d) 868.

We shall now proceed to discuss the questions involved, the first of which is as follows:

*Does the right of repurchase granted by the Act of 1939 extend to the heirs or devisees of the person who was the owner at the time the property was condemned?*

Mrs. Cain died about a year after the Authority acquired this property. Appellant says that any right of repurchase was personal to her and did not descend to her heirs at law or the devisees under her will. The statute provides that if the lands acquired in fee simple, or any portion thereof, are not occupied or used for certain specified purposes, the "owner" shall have the absolute right to repurchase same. What is the meaning of the word "owner" as used in this statute? In *City of Phoenix v. State ex rel. Harless, Ariz.,* 137 P. (2d) 783, 146 A. L. R. 1255, the Court stated that "the word 'owner' has no technical meaning, but its definition will contract or expand according to the subject matter to which it is applied." And in *Good v. Jarrard,* 93 S. C. 229, 76 S. E. 698, 701, 43 L. R. A., N. S., 383, this Court said that the word "is of very comprehensive signification" and

as applied to real estate, does not necessarily mean one owning the fee simple title, but "the term has been applied to any one having a defined interest in land".

For the purposes of the Act, the word "owner" is █ defined in Section 9114 which has been heretofore quoted. We do not think that either the statutory definition therein given or the context of the Act, apart from such statutory definition, supports the narrow construction advanced by appellant. It is our view that any right of repurchase possessed by Mrs. Cain passed under her will to the respondents.

Of some analogy are tax statutes giving a right of redemption to the "owner". It has been rather consistently held that such right is not personal to the individual owning the property at the time of the tax sale. *Rogers v. City of Lynn,* 200 Mass. 354, 86 N. E. 889; *Banchor v. Proctor,* 88 Kan. 510, 129 P. 526; *Wyatt v. Beard,* 179 Ark. 305, 15 S. W. (2d) 990; *Clark v. McClaugherty,* 53 W. Va. 376, 44 S. E. 269. It is stated in 51 Am. Jur., Taxation, Section 1106, that while the right of redemption "is not an estate in land, it is a statutory privilege which passes to the heir of the owner in the same manner as the land itself."

Our attention is called to the fact that in a preceding portion of Section 9113 giving the right to pass over and across the 100-foot strip for the purpose of ingress and egress to the reservoirs, such right is given to "the previous owner of said 100 feet strip, and his heirs and assigns." It is argued that if it had been intended to extend the right of repurchase to the heirs or devisees of the owner that this right would have been likewise expressly extended to such heirs or devisees. But we do not think that in a statute so loosely worded the omission is of much significance.

The second question is:

*Does the right of repurchase exist where the project for which the land was condemned is completed and put in operation within five years after the property was acquired?*

The Act provides that unless the Authority gives notice to the contrary, it shall hold fee simple title to (1) "all properties * * * which said Authority shall determine are to be actually covered by impounded water, or occupied by dams, structures, or borrow pits", and (2) "all lands between the high water mark, as established by said state authority and a line not exceeding 100 lineal feet beyond the maximum high water mark of water impounded or to be impounded, and within a reasonable distance from any dam, dike or structure". It is then provided "that if the lands, or any portion thereof, acquired by said state authority hereunder are not occupied for the purposes of erecting dams, dikes and structures, including lands acquired near said dams, dikes and structures for purposes of protecting said dams, dikes and structures and for purposes of obtaining materials for maintenance, and the one hundred feet strip from the said maximum high water mark, *and* unless said lands above the dams, dikes and structures are actually covered with water, within a period of five years from the date of acquiring lands hereunder, the owner of any tracts of land acquired by said state authority under this article shall have the absolute right to repurchase said lands from said state authority * * *." (Italics ours). There follows the basis of determining the amount to be paid by the owner and a limitation on the time in which the right of repurchase may be exercised.

Appellant contends, quoting from its brief, that the "right to repurchase was intended by the General Assembly to arise in case the project for which lands were taken under the Act was not constructed and put into operation by the impounding of water within the five year period stated in the proviso, but was not intended to arise if the project was constructed and put into operation by the impounding of water therein within such period." Stated differently, appellant says that the conditions to be fulfilled by the Authority in order to retain the land acquired in fee simple are: (1) That the lands acquired or *some portion thereof* must be

·occupied for the purposes of "erecting dams, dikes and structures", etc. and (2) that the lands above the dams, dikes and structures must be actually covered with water within a period of five years from the date of acquisition. It is said that both of these conditions have been met. In support of this argument considerable emphasis is placed upon the conjunction "and", and on the phrase "any portion thereof."

We do not think that the suggested construction has any reasonable support in the Act. If the right of repurchase was only to be effective in the event the project was not completed and put into operation by the impounding of water within five years, it would have been a very simple matter to have so stated. The statute clearly contemplates that the owner shall have the right to repurchase the land condemned or any·part thereof unless it is occupied for one of the purposes specified in the proviso *or* covered with water within five years from the date acquired. In other words, we think the word "and" which we have heretofore italicized in quoting the repurchase proviso should be construed to mean "or". Such is necessary to effectuate the legislative intent. Words are subservient to the intent and not the intent to the words. *Ashley v. Ware Shoals Mfg. Co.,* 210 S. C. 273, 42 S. E. (2d) 390. Numerous cases will be found in which clerical errors in statutes have been corrected in accordance with this principle. In *Robson v. Cantwell, Charleston County Supervisor,* 143 S. C. 104, 141 S. E. 180, 181, "and" was changed to "or" to effectuate the legislative intent, while in *Fulghum v. Bleakley,* 177 S. C. 286, 181 S. E. 30, "or" was interpreted as meaning "and". Our conclusion that "and" in the proviso giving the right of repurchase should be construed as meaning "or" is supported by the use of the word·"or" in a preceding portion of Section 9113 where it is stated that unless notice to the contrary is given, the Authority shall hold fee simple title to "all properties * * * which said authority shall determine are to be actually covered by impounded water, *or* occupied by dams, structures, or borrow pits". (Italics ours.)

Closely allied with the question just discussed is the third question, which is:

*Does the Act permit repurchase of a portion of a tract condemned as a unit?*

We think the phrase "or any portion thereof" was inserted in the statute to permit the owner to repurchase any portion of the land condemned not occupied for one of the purposes specified in the proviso or covered with water. There is no reasonable basis for the following construction advanced by appellant in its brief: "The words 'or any portion thereof' were used in the proviso to make it clear that the whole of the land taken under the Act did not have to be occupied for the purposes specified, or actually covered with water, to entitle the Authority to retain them as against the right of repurchase if the project was completed." Under appellant's construction, if only a negligible portion of the 1170 acre tract of land had been used for the purposes specified in the proviso, the owner would have no right to repurchase the remainder. Such an absurd result could not have been intended.

It is argued that if the proviso contemplated a repurchase of a part of the land condemned, words to that effect would have been inserted in that portion of the statute which provides that the owner "shall have the absolute right to repurchase said lands from said state authority." But it was not necessary to add the phrase "or any portion thereof" after the word "lands" in this part of the statute. The words "said lands" clearly have reference to "the lands, or any portion thereof" appearing at the beginning of the proviso.

The argument is also made that the statute furnishes no basis for determining the amount to be paid by the owner for a portion of the land condemned and no consideration is given to the question of enhancement in value of such portion by reason of the construction of the project. It is said that the provision of the statute giving the right to repurchase "upon the payment by the owner to said state author-

ity of the amount paid by said state authority to said owner less any damages which said lands may sustain by reason of said state authority having occupied the same * * *", clearly contemplates a total rescission of the transaction and negatives the idea that the owner would be permitted to repurchase a portion of the property acquired from him. While this argument is plausible, we do not think the omissions mentioned are sufficient to justify us in disregarding the preceding clearly expressed right given to the owner to repurchase any portion of the land condemned not used for the purposes specified in the proviso.

Finally, it is said that the construction which we have adopted permits the owner to repurchase a portion of the property without any showing that it is not necessary to the operation of the project. But the fact that the land sought to be repurchased may be devoted to some essential use is not the test. The criterion is whether it is being used or occupied for some purpose specified in the provision granting the right of repurchase.

We now turn to the fourth question, which is as follows:

*Is the 33 acre tract less than 100 feet from the "maximum high water mark" of Lake Moultrie?*

Under the statute the privilege of repurchase does not extend to lands within 100 feet of the "maximum high water mark" of the impounded water. It appears from the testimony that the project was designed to hold water to a maximum point of 81.5 feet above mean sea level. The highest point on the 33 acre tract is 81.5 feet above mean sea level and this slopes down to a point approximately 75 feet above mean sea level. If the water in Lake Moultrie were raised to the maximum designed level of 81.5 feet, the whole 33 acre tract would be submerged. But the testimony shows that this tract has never been covered with water, except perhaps under unusual conditions when only a small portion was covered temporarily. In fact, the record shows that the water level of Lake Moultrie has never been above 75.93 feet. The

dead storage level is 60 feet. One of the witnesses stated that the Authority endeavored to operate "on an average head of about 70". Appellant contends that the Authority has fixed a maximum water level of 81.5 feet from which the 100 foot strip is to be measured, while respondents contend that the maximum high water mark within the contemplation of the statute is 75 feet.

One of appellant's experts, upon being asked to explain the maximum designed elevation of 81.5 feet, said:

"A. Well, a designed flood is based on what we call a thousand year flood; that 1,000-year flood might take place next week with this hurricane that is coming. We can be safe for 999 years and then have it.

"Q. You can't take into consideration in your actual design and construction of projects a thousand-year contingency, can you? A. No, the project is designed to be amortized in 50 years but your 1,000-year flood may come any time from now until your 1,000 years is up."

Upon this question one of respondents' experts testified:

"Q. Now, Mr. Roberts, * * * will you state for the Court whether or not there are any conditions, which may be reasonably expected to arise in this area, based on weather reports and any other information that is available, whether any conceivable conditions, based on experience and reports, under which the 33-acre tract of land involved in this case can be expected to overflow and stay overflowed in the operation of this hydro-electric project? A. You mean are there any conditions under which the water would be impounded on this property?

"Q. Yes, based on experience, officials' reports or anything else in your knowledge? A. Impounded water, as I understand it, is water impounded behind a dam. There are no conditions at Santee-Cooper by which this property would be covered by impounded water. There are no conditions that could arise that this piece of land would be covered by flood waters. It is possible that extreme winds could temporarily blow water up on this land.

"Q. If it did what would happen to that water, would it stay there? A. It would stay there as long as the wind was blowing at that velocity and as the wind eased the water would flow off, just as it does when the wind blows the water in the streets of Charleston or anywhere else."

\* \* \*

"Q. Now, if in the operation of this project the water level were increased to 81.5 feet what in general would be the condition that would create that increase? A. I know of no condition that is possible to increase the water to that elevation in the Pinopolis reservoir and no condition that is probable in the Santee reservoir but using engineering formulas, it is possible to happen approximately once in a thousand years on the Santee River but not in the Pinopolis reservoir."

Some question has been raised as to whether under the license issued by the Federal Power Commission, the Authority is limited to impounding water up to 75 feet. This matter was considered in *Connor v. S. C. Public Service Authority,* 91 F. Supp. 262. However, we need not decide this question and shall assume that the Authority may lawfully establish a maximum water level of 81.5 feet. Upon this assumption, is the "maximum high water mark" contemplated by the Act 81.5 feet as claimed by appellant? We think not. It will be observed that this level was fixed to take care of what was described by one of the witnesses as "the known and the unknown". We have no reason to criticise, and indeed we are not in a. position to question, the precautions taken by the engineers in designing this project. But the maximum high water mark contemplated by the General Assembly was not some vague, unknown and speculative level that in all probability would never occur and if it did occur, would result in the mere temporary overflow of adjoining lands. We think the Act contemplates a more practical, certain and realistic definition and that it is safe to assume that the maximum level has been reached during the period of approximately ten years that the project has

been in operation. Evidently the Authority has so concluded, otherwise it never would have expended more than $30,000-.00 in making improvements on the 33 acre tract. It is inconceivable that this would have been done if there was any reasonable risk of this peninsula being submerged.

In *Dincans v. Keeran, Tex. Civ. App.*, 192 S. W. 603, the Court construed the term "highest tide", when used in referring to boundaries of lands adjoining navigable waters, as not meaning the "highest crest of storm driven sea water." In *Santee River Cypress Lumber Co. v. Elliott*, 153 S. C. 179, 150 S. E. 683, it was held, quoting syllabus, that the "term 'high-water mark', as used in deed making 'high-water mark of the swamp' eastern boundary, means mark or appearance of ground made by and as a result of usual high water, and does not refer to temporary floods unusual and brief which may cover large areas."

Respondents concede that the Authority would not be liable to them for any damage hereafter sustained by the overflow of water on this 33 acre tract. The Referee held "that if the land is reconveyed to the plaintiffs (respondents) they take it with the burdens incident to the lawful operation of the project and ·with full notice of the risks entailed in the ownership, use and occupation of the property."

The fifth question is:

*Does the 33 acre tract constitute "lands acquired near said dams, dikes and structures for purposes of protecting said dams, dikes and structures"?*

We agree with the Referee "that there are no dams, dikes or anything connected with power development on the property", or anything supporting or protecting any dam or dike. The tract in controversy is located three or four miles from the power house and two or three miles, as one witness states, from "the nearest structure of any kind that has anything to do with the power development." It is true that there is located on this tract a pond used for experimental purposes in the control of malaria, but nothing

connected therewith constitutes "dams, dikes and structures" within the meaning of these terms as used in Section 9113. The statement is made that during World War II appellant's anti-sabotage patrol used this tract to protect the dams and power house from destruction and that it is now used for experiments in health control. But we do not agree with appellant that these functions can be classified as "protecting said dams, dikes and structures" within the meaning of Section 9113.

We next consider the sixth question which is:

*Are the lands in controversy occupied by the Authority "for the purpose of erecting  *  *  *.. structures"?*

Undoubtedly the buildings on this tract constitute "structures" within the ordinary meaning of that word, but we agree with the Referee "that the word 'structures' as here used must be subjected to the well established rule of *ejusden generis* restricting its interpretation to structures of the general character of or at least substantially related in use and operation to dams and dikes."

The foregoing conclusion is sustained to some extent by *Yukon Pocahontas Coal Co. v. Ratliff,* 181 Va. 195, 24 S. E. (2d) 559, where the Court held, quoting syllabus: "Though homes, hotels, hospitals, gardens, etc., for employees may be essential to mining operations, they are not such 'devices' and 'structures' as were contemplated by language of mineral deed conveying, in addition to minerals and mining rights, sufficient surface for specified purposes in connection with mining operations and for other devices and structures necessary for economical mining and removal of minerals from described and adjacent land."

It is clear that in Section 9113 the word "structures" was used in a restricted sense and was not intended to include every building which may be used by the Authority for a corporate purpose. For instance, appellant's office building at Moncks Corner, although essential to the management and

operation of the project, could not be classified as a structure within the contemplation of Section 9113.

Before concluding our discussion of this phase of the case, it might not be amiss to state that respondents have not appealed from that portion of the circuit decree granting appellant the right to remove "such buildings and other improvements, including appliances and equipment, as have been placed by the defendant (appellant) on the property, provided such removal can be accomplished without material damage to the lands."

The seventh and final question for determination is:

*Does the right of repurchase exist where the land in controversy is being used and occupied in furtherance of any of the purposes for which the Authority was established?*

Appellant argues that the right to repurchase should be denied because the 33 acre tract was acquired in fee and is now being used by the Authority, after expending a large amount of money for improvements, in furtherance of its corporate purposes.

We are not in accord with appellant's view that where property is acquired in fee simple under the Act of 1939, the right of repurchase may not be exercised as to any land necessary to the accomplishment of any of the purposes for which the Authority was established, although not for a purpose specified in the proviso relating to repurchase. It is true that in the first portion of Section 9113, the power of eminent domain is referred to in very general terms, but this power was subsequently restricted and qualified with reference to property held in fee simple. If the General Assembly had intended to grant to the Authority an unlimited and unqualified right to retain all property acquired in fee simple which was essential for any of its corporate purposes, there would have been no necessity whatever for the limitations on use and occupancy contained in Section 9113. It is clear from this section that the right to retain property acquired in fee simple was conditioned upon

its being used for certain specified purposes. Moreover, the 1170 acre tract was not condemned for general corporate purposes but for the following specified uses stated in the notice of condemnation: "All of which said lands are to be actually covered by impounded waters, or occupied by dams, structures or borrow pits of the said South Carolina Public Service Authority, or will be included within a one hundred (100′) foot strip of land from the maximum high water mark of said impounded waters, and within a reasonable distance of a dam, dike or structure of said Authority."

It is also argued that appellant has the right of condemnation under other statutes for any corporate purpose and should not now be compelled to again condemn this property which it says is essential to the discharge of its functions. We do not undertake to decide what rights of condemnation appellant has under other statutes. Neither are we now called upon to say whether the use now made of the 33 acre tract is for a corporate purpose. The issues before us must be determined by the Act of 1939 under which appellant elected to proceed. To deny respondents the right of reconveyance simply because the 33 acre tract is being used for essential purposes, although not for one of the purposes specified in the Act, would necessitate our adding a limitation on the right of repurchase not contained in the Act. This we are not at liberty to do. As stated by Chief Justice McIver in *Beaty v. Richardson,* 56 S. C. 173, 34 S. E. 73, 46 L. R. A. 517, "Judges are not to mold the language of statutes in order to meet an alleged convenience or an alleged equity; are not to be influenced by any notions of hardship, or of what in their view is right and reasonable or is prejudicial to society."

Lastly, an appeal is made to the discretion of the Court. It is said that appellant had in good faith expended a vast amount of money on this property and that a reconveyance would produce a very unjust result. But the discretion vested in a court of equity in ordinary cases for specific performance has no application to the action before us where we are called

upon to enforce a specific right granted by statute. It might not be amiss to state that we do not have before us any claim of betterments and we intimate no opinion as to whether such a claim could be successfully asserted.

All exceptions are overruled and the two orders appealed from affirmed.

BAKER, C. J., and FISHBURNE, STUKES and TAYLOR, JJ., concur.